**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 25 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

ADARAND CONSTRUCTORS, INC.,
a Colorado corporation,

     Plaintiff - Appellee,

v.

RODNEY E. SLATER, Secretary of
the Department of Transportation;
KENNETH R. WYKLE, Administrator
of the Federal Highway
Administration; VINCENT F.
SCHIMMOLLER, Administrator of
Region VIII of the Federal Highway
Administration; LARRY C. SMITH,
Engineer of the Central Federal Lands
Highway Division,

     Defendants - Appellants,

---

PACIFIC LEGAL FOUNDATION;
ASSOCIATED GENERAL
CONTRACTORS OF AMERICA,
INC.; EMPLOYMENT LAW
CENTER; MINORITY BUSINESS
ENTERPRISE LEGAL DEFENSE
AND EDUCATION FUND, INC.,

     Amici Curiae.

No. 97-1304

---

**OPINION ON REMAND**

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 90-K-1413)**

---

Leslie A. Simon, Attorney, United States Department of Justice, (Nancy E. McFadden, General Counsel, Paul M. Geier, Assistant General Counsel for Litigation, Edward V.A. Kussy, Acting Chief Counsel, Federal Highway Administration, Sara McAndrew, Trial Attorney, Peter S. Smith, Trial Attorney, of the United States Department of Transportation, Washington, D.C.; Isabelle Katz Pinzler, Acting Assistant Attorney General, William R. Yeomans, Acting Deputy Assistant Attorney General, Bill Lann Lee, Acting Deputy Assistant Attorney General, Thomas E. Perez, Deputy Assistant Attorney General, Mark L. Gross, Attorney, Louis E. Peraertz, Attorney, of the United States Department of Justice, Washington, D.C., with her on the briefs), for Defendants - Appellants.

William Perry Pendley (Todd S. Welch and J. Scott Detamore, with him on the briefs), Mountain States Legal Foundation, Denver, Colorado, for Plaintiff - Appellee.

Robin L. Rivett, Sharon L. Browne, and Stephen R. McCutcheon, Jr., for Pacific Legal Foundation, Sacramento, California, filed an amicus curiae brief.

Julian A. Gross and William C. McNeill III, Legal Aid Society of San Francisco, for the Employment Law Center, San Francisco, California, and Franklin M. Lee and Tracie Anita Watkins for the Minority Business Enterprise Legal Defense and Education Fund, Inc., Washington, D.C., filed an amicus curiae brief.

Michael E. Kennedy, General Counsel for Associated General Contractors of America, Inc., and John G. Roberts, Jr., David G. Leitch, and H. Christopher Bartolomucci of Hogan & Hartson, L.L.P., Washington, D.C., filed an amicus curiae brief for Associated General Contractors of America, Inc.

---

Before **LUCERO** , Circuit Judge,   **McKAY** , Senior Circuit Judge, and     **MURPHY** , Circuit Judge.

---

**LUCERO** , Circuit Judge.

_____

Following the Supreme Court's vacation of our dismissal on mootness grounds, we address the merits of this appeal, namely, the federal government's challenge to the district court's grant of summary judgment to plaintiff-appellee Adarand Constructors, Inc.  In so doing, we must resolve the constitutionality of the use in federal subcontracting procurement of the Subcontractor Compensation Clause ("SCC"), which employs race-conscious presumptions designed to favor minority enterprises and other "disadvantaged business enterprises" ("DBEs").  Our evaluation of the SCC program utilizes the "strict scrutiny" standard of constitutional review enunciated by the Supreme Court in an earlier decision in this case, Adarand Constructors, Inc. v. Peña, 515 U.S. 200 (1995) (" Adarand III").

In his concurring opinion in Adarand III, Justice Scalia succinctly articulated this Nation's guiding aspiration:  "In the eyes of government, we are just one race here.  It is American."  Id. at 239 (Scalia, J., concurring in part and concurring in the judgment).  Until that future day when national aspiration and national reality converge, the Court has made clear that under certain circumstances the federal government may use race-conscious means to remedy the effects of historical and present-day racial discrimination.  Inherently, we resolve whether the two branches of the government—the Legislative and the

-3-

Executive—that have chosen to hasten that future day have met the constitutional standards enunciated by the third branch. Since the district court last considered this case, and after lengthy congressional hearings in response to the Adarand III decision, the federal government has significantly changed the way in which it implements the challenged race-conscious programs in highway construction contracting. It is ultimately our considered judgment that the SCC program and the DBE certification programs as currently structured, though not as they were structured in 1997 when the district court last rendered judgment, pass constitutional muster: They are narrowly tailored to serve a compelling governmental interest. Thus, exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reverse the judgment of the district court below.

## I

The Supreme Court has characterized the facts of this case as "fairly straightforward," Adarand III, 515 U.S. at 206, summarizing the relevant facts as follows:

> In 1989, the Central Federal Lands Highway Division (CFLHD), which is part of the United States Department of Transportation (DOT), awarded the prime contract for a highway construction project in Colorado to Mountain Gravel & Construction Company. Mountain Gravel then solicited bids from subcontractors for the guardrail portion of the contract. Adarand, a Colorado-based highway construction company specializing in guardrail work, submitted the low bid. Gonzales Construction Company also submitted a bid.

-4-

Id. at 205. At the time, Gonzales was certified as a small business owned and controlled by socially and economically disadvantaged individuals, while Adarand was not. See id. This litigation centers around the SCC, a clause which was included in CFLHD's prime contract with Mountain Gravel. The SCC provided "that Mountain Gravel would receive additional compensation if it hired subcontractors certified as small businesses controlled by 'socially and economically disadvantaged individuals.'" Id. (citation omitted).

Adarand submitted an affidavit stating that but for the additional compensation Mountain Gravel obtained by hiring Gonzales, a certified business, it would have hired Adarand for the guardrail work. See id. Adarand sued, arguing that the use of a race-conscious presumption in determining who is a socially and economically disadvantaged individual for purposes of the SCC violated its Fifth Amendment equal protection rights. See id. at 205-06.

In Adarand Constructors, Inc. v. Skinner, 790 F. Supp. 240 (D. Colo. 1992) ("Adarand I"), the district court addressed Adarand's challenge to "the DBE program as administered by the CFLHD within Colorado." Id. at 241 (footnote omitted). Without focusing specifically on the SCC and its operation, the court in Adarand I upheld as constitutional, under intermediate scrutiny, statutory provisions defining DBEs and setting goals for DBE participation in government contracting. See id. at 241, 244-45 (relying on Fullilove v.

Klutznick , 448 U.S. 448, 480 (1980); Metro Broadcasting, Inc. v. FCC , 497 U.S. 547, 598-601 (1990)).

In Adarand Constructors, Inc. v. Peña , 16 F.3d 1537, 1539 (10th Cir. 1994) ("Adarand II "), this Court affirmed the district court's judgment on different grounds . We concluded that Adarand had standing to challenge the SCC program as it pertains to minority business enterprises but not women-owned business enterprises and addressed our inquiry to the SCC as a program implemented pursuant to § 502 of the Small Business Act of 1958 ("SBA"), Pub. L. No. 85-536, 72 Stat. 384 (codified as amended, 15 U.S.C. § 631 et seq. ). See Adarand II, 16 F.3d at 1543 (citing 15 U.S.C. § 644(g)). Like the district court, we relied on Metro Broadcasting , 497 U.S. at 565, applying intermediate scrutiny to the SCC and holding "the SCC program . . . constitutional because it is narrowly tailored to achieve its significant governmental purpose of providing subcontracting opportunities for small [DBEs], as required under section 502 of the [SBA]." Adarand II , 16 F.3d at 1547.

The Supreme Court reversed. It overruled Metro Broadcasting and cast doubt on Fullilove insofar as that case might be read to apply less than strict scrutiny to federal programs involving racial classifications. See Adarand III ,

515 U.S. at 227, 235. [1]

On remand, the district court held the SCC program unconstitutional, finding it insufficiently narrowly tailored to further a compelling interest because the program was both over- and under-inclusive, including minority individuals who were not in fact disadvantaged and excluding non-minority individuals who were disadvantaged. See Adarand Constructors, Inc. v. Peña, 965 F. Supp. 1556 (D. Colo. 1997) (" Adarand IV "). With regard to the Court's pronouncement in Adarand III that strict scrutiny is not "fatal in fact," the district court found it "difficult to envisage a race-based classification" that would ever be narrowly tailored, thereby effectively pronouncing strict scrutiny fatal in fact. Id. at 1580. The district court granted summary judgment to Adarand.

Following Adarand IV , we considered the government's contention that subsequent events had rendered the case moot. See Adarand Constructors, Inc. v. Slater , 169 F.3d 1292 (10th Cir. 1999) (" Adarand V "). Specifically, because Adarand applied for and was granted DBE certification by the Colorado

---

[1] The principal focus of Adarand III was not an analysis of the particular statutes and regulations before the Court under its newly-announced standard, but the far more abstract question of whether "benign" race-conscious programs are subject to the "strict scrutiny" doctrine, a question which the majority answered in the affirmative. See Adarand III , 515 U.S. at 225-27. In its enunciation of the strict scrutiny standard and its overruling of Metro Broadcasting , the Court accorded very little attention to the application of the strict scrutiny test to the particular programs at issue in this case.

Department of Transportation ("CDOT"), we concluded that Adarand could no longer demonstrate an injury stemming from the SCC sufficient to confer standing. See id. at 1296-97. Hence, the case was moot. See id.

The Supreme Court disagreed. See Adarand Constructors, Inc. v. Slater, 120 S. Ct. 722 (2000) (" Adarand VI "). Relying on its decision in Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc. , 120 S. Ct. 693 (2000), handed down on the same day as its Adarand VI remand, the Court stated it had "recently noted" that a possibility of a defendant "engag[ing] in (or resum[ing]) harmful conduct" might be too speculative to confer standing but not too speculative to overcome mootness. Adarand VI , 120 S. Ct. at 726 (quoting Friends of the Earth , 120 S. Ct. at 699). The Court held it was "far from clear" that DOT would not initiate proceedings to revoke Adarand's status and because "it is impossible to conclude that respondents have borne their burden of establishing that it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur,' petitioner's cause of action remains alive." Id. at 726-27 (quoting Friends of the Earth, Inc. , 120 S. Ct. at 708). With the reversal of our judgment in Adarand V , this appeal was remanded to us for consideration on the merits. See id. at 726-27.

In the discussion that follows, we first dispose of three threshold concerns: (1) a determination of the appropriate versions of the statutes and regulations at

issue in this case; (2) the scope of our review of the SCC program; and (3) a brief overview of the relevant statutory framework and of the SCC program. Then, in Part III we subject the SCC program to strict scrutiny, examining the compelling interest underlying the program as well as its narrow tailoring, and addressing specific issues that the Supreme Court in Adarand III directed that we consider. Finally, in Part IV, we briefly discuss the government's request that we consolidate with the instant action a pending, potentially related case, originally filed under the name Adarand Constructors, Inc. v. Romer, No. CIV. A. 97-K-1351 (D. Colo. June 26, 1997).

## II

We begin by addressing the scope of our inquiry in this appeal. It is essential that we decide which versions of the statutes and regulations at issue are properly before us, as well as which portions of those statutes and regulations are relevant to this appeal.

Several statutes are implicated in this case, notably §§ 8(a), 8(d) and 502 of the SBA (codified as amended at 15 U.S.C. §§ 637(a), (d), and 644(g)), § 106(c) of the Surface Transportation and Uniform Relocation Assistance Act of 1987 ("STURAA"), Pub. L. No. 100-17, 101 Stat. 132, 145 (1987), § 1003(b) of the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"), Pub. L. No. 102-240, 105 Stat. 1914, 1919-21 (1991), § 1101(b) of the Transportation

Equity Act for the 21st Century of 1998 ("TEA-21"), Pub. L. No. 105-178, 112 Stat. 107, 113 -15 (1998), as well as their accompanying administrative regulations.

### A. The Versions To Be Considered

With regard to the foregoing statutes, regulations, and SCC, the parties disagree as to whether we may properly consider intervening changes in the law between 1992 when Adarand I was handed down and the present. [2] Our resolution of that dispute is ultimately compelled by the logic of the well-settled precedent of both the Supreme Court and this Circuit. Adarand seeks only prospective declaratory and injunctive relief. See Adarand III, 515 U.S. at 210. [3] Application of the intervening statutory and regulatory changes to this type of claim does not implicate any presumption against the retroactive application of statutes. See Landgraf v. USI Film Prods., 511 U.S. 244, 273 (1994) ("Even absent specific legislative authorization, application of new statutes passed after

---

[2] We have therefore requested and received supplementary briefing from the parties on intervening changes in the statutory and regulatory scheme at issue in the instant action.

[3] Although Adarand also seeks "such other and further relief as to the Court seems just and equitable," this highly general language does not constitute a prayer for retrospective relief under the circumstances of this case. (Appellants' App. at 10.) Moreover, on appeal Adarand seeks to uphold the district court's grant of summary judgment and declaratory and injunctive relief and has not filed a cross-appeal seeking damages or another form of retrospective relief.

-10-

the events in suit is unquestionably proper in many situations.  When the intervening statute . . . affects the propriety of prospective relief, application of the new provision is not retroactive.");  Jurado-Gutierrez v. Greene, 190 F.3d 1135, 1149 (10th Cir. 1999) (applying Landgraf), cert. denied sub nom. Palaganas-Suarez v. Greene, 120 S. Ct. 1539 (2000);  see also Jones v. Hess, 681 F.2d 688, 695 n.9 (10th Cir. 1982) ("Generally an appellate court must apply the law in effect at the time it renders its decision where a change in law occurs while a case is on direct appeal, although there may well be an exception to this rule to prevent manifest injustice." (citations omitted));  McMahan v. Hunter, 179 F.2d 661, 663 (10th Cir. 1950) ("[W]here a rule of law was changed after the decision in the trial court but before the decision in the Appellate Court, the decision in the Appellate Court must be according to the new law."); 13A Charles Alan Wright et al., Federal Practice & Procedure, Jurisdiction 2d § 3533.6 (1984) ("Ordinarily, courts . . . apply[] the law in force at the time of decision, unless a good reason appears for ignoring the change.");  cf. Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 836-37 (1990).  To ignore intervening changes in the statutory and regulatory framework underlying this litigation would be to shirk our responsibility to strictly scrutinize the real-world legal regime against which Adarand seeks prospective relief.  The changes in the law are squarely before us today, and we discern no reason to leave their scrutiny to future

litigation, in effect prolonging the instant litigation and fostering "both a wasteful expenditure of resources by courts and litigating parties and the gradual undermining of public confidence in the judiciary—in short, Dickens's Jarndyce v. Jarndyce syndrome." McIlravy v. Kerr-McGee Coal Corp., 204 F.3d 1031, 1035 (10th Cir. 2000).

However, considering that we are reviewing a decision of the district court below that relied on older versions of the statutes, regulations, and SCC, and because we are mindful that future statutory and regulatory changes may cause the government to "engage in (or resume) [the] harmful conduct" in question earlier in this litigation so as to militate against a finding of mootness, Adarand VI, 120 S. Ct. at 726 (quoting Friends of the Earth, 120 S. Ct. at 699), we consider the statutory and regulatory framework in its prior stages as well. [4] See

_____

[4] Thus, we refuse the government's invitation to ignore the SCC program by virtue of its citation to a March 29, 2000 memorandum from the Manager of the Federal Lands Program indicating that the SCC is no longer in use in federal highway construction procurement contracts. We likewise reject the government's argument, relying on Lawrence v. Chater, 516 U.S. 163, 165-66 (1996), that we must remand this case to the district court for consideration of intervening statutory and regulatory changes. The government's reliance on Lawrence is misplaced: That case involved the Supreme Court's exercise of its power to "grant certiorari, vacate the judgment below, and remand the case" to a "lower federal court" in light of intervening regulatory changes, and not the power of a lower federal court to decide a case on remand from the Supreme Court. Id. (emphasis added). In the present case, the parties have briefed intervening changes in the law, there are no disputed factual issues, and we see no reason to delay this already protracted litigation by remanding to the district

(continued...)

also Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, 508 U.S. 656, 662 (1993) ("[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982))). It is not fanciful to suggest that the government may retreat to prior practice, but if the government did so, this opinion expressly holds that such an action would be unconstitutional for the reasons discussed below.

## B. The Scope of the SCC Program Under Scrutiny

We next clarify the scope of the SCC program under review. In that regard, we are bound by the Supreme Court's ruling on Adarand's standing in Adarand III as law of the case. Based on its conclusion that "CFLHD is likely to let contracts involving guardrail work that contain a[n] [SCC] at least once per year in Colorado, that Adarand is very likely to bid on each such contract, and that Adarand often must compete for such contracts against small disadvantaged businesses," the Court held Adarand has standing to challenge "the race-based

_____

[4](...continued)
court, especially considering the district court's statement that it would be "difficult to envisage a race-based classification" that would ever be narrowly tailored, thereby effectively pronouncing strict scrutiny fatal in fact, Adarand IV 965 F. Supp. at 1580, a view which we reject in the discussion that follows.

-13-

rebuttable presumption used in some certifications under the Subcontracting Compensation Clause." Adarand III, 515 U.S. at 212-13 (citation omitted).

We recognize, however, that there are programs that the Supreme Court did not hold Adarand has standing to challenge. First is the § 8(a) program, discussed below. See 15 U.S.C. § 637(a). Subsection 8(a) does not involve the use of SCCs, nor has Adarand made any showing that it has been injured by non-inclusion in the § 8(a) program. Second, we specifically held in Adarand II that Adarand has not shown standing to challenge "the provisions of the SCC program pertaining to women-owned business enterprises (WBE)." 16 F.3d at 1543. This conclusion was left undisturbed by the Supreme Court, see Adarand III, 515 U.S. at 210-12, and remains law of the case, and we discern no clear error in that prior decision or manifest injustice sufficient to warrant overriding the law of the case doctrine, see Agostini v. Felton, 521 U.S. 203, 236 (1997); McIlravy, 204 F.3d at 1034-35. Furthermore, our decision in Adarand II, as well as the Supreme Court's remand in Adarand III, was limited to the question of the constitutionality of the use of a race-conscious presumption in the SCC program. See Adarand III, 515 U.S. at 237-38. This case does not involve, nor has Adarand ever demonstrated standing to bring, a generalized challenge to the policy of maximizing contracting opportunities for small disadvantaged businesses set forth in 15 U.S.C. §§ 637 and 644(g), or to the various goals for

-14-

fostering the participation of small minority-owned businesses promulgated pursuant to 15 U.S.C. § 644(g), also discussed below. Nor are we presented with any indication that Adarand has standing to challenge paragraphs (4)-(6) of 15 U.S.C. § 637(d). Finally, we agree with the government that throughout the course of this litigation, Adarand's challenge has been to the use of the SCC in direct federal highway procurement contracts entered into by the CFLHD with funds appropriated under STURAA, ISTEA, and TEA-21. In the discussion that follows, we therefore address the constitutionality of the relevant statutory provisions  as applied  in the SCC program, as well as their    facial constitutionality. To the extent the district court's judgment can be construed as having reached statutes, programs, and issues beyond the scope of Adarand's standing and the Supreme Court's remand in    Adarand III , we reverse that judgment.

### C. Overview of the Statutory Framework and the SCC

We are now in a position to offer a brief overview of the statutory framework and the SCC underlying this litigation.

> The [SBA]  . . . declares it to be "the policy of the United States that small business concerns, [and] small business concerns owned and controlled by socially and economically disadvantaged individuals, . . . shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency." § 8(d)(1), 15 U.S.C. § 637(d)(1). The [SBA] defines "socially disadvantaged individuals" as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities," § 8(a)(5), 15 U.S.C. § 637(a)(5), and it defines

-15-

"economically disadvantaged individuals" as "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." § 8(a)(6)(A), 15 U.S.C. § 637(a)(6)(A).

In furtherance of the policy stated in § 8(d)(1), the Act establishes "[t]he Government-wide goal for participation by small business concerns owned and controlled by socially and economically disadvantaged individuals" at "not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year." 15 U.S.C. § 644(g)(1). It also requires the head of each federal agency to set agency-specific goals for participation by businesses controlled by socially and economically disadvantaged individuals. Id.

Adarand III, 515 U.S. at 206. These goals must "realistically reflect the potential" of small disadvantaged businesses to perform subcontracts. See 15 U.S.C. § 644(g)(2), (h)(1). Under both § 8(a) and § 8(d), subcontractors can be certified as DBEs, qualifying them for the SCC program at issue in this litigation.

STURAA, ISTEA, and TEA-21, the transportation appropriations statutes at issue in this case, incorporate the presumption of disadvantage from SBA § 8(d). See STURAA § 106(c)(2)(B), ISTEA § 1003(b)(2)(B); TEA-21 § 1101(b)(2)(B) (providing that the term "socially and economically disadvantaged individuals" has the meaning of such term under SBA § 8(d) "and relevant subcontracting regulations promulgated pursuant thereto."). STURAA, ISTEA, and TEA-21 all set forth aspirational goals of 10% DBE participation in

federal subcontracting.   See STURAA § 106(c)(1); ISTEA § 1003(b)(1); TEA-21 § 1101(b)(1). [5]

The SCC is a means of implementing the various statutory goals and directives at issue in this litigation.  This clause provides a financial bonus of up to 10% of an approved subcontract (no more than 1.5% or 2% of the original contract, depending on how many DBEs are employed) to a prime contractor for employing a DBE. (  See Appellants' App. at 55-56.)  Subcontractors must be certified as DBEs by "the SBA, a state highway agency, or some other certifying authority acceptable to the contracting officer" pursuant to the "[§] 8(a) or [§] 8(d) program, or certification by a State under the DOT regulations."        Adarand III, 515 U.S. at 209-10.  In November of 1997, the SCC at issue in        Adarand IV was revised, leaving the basic framework in place.  At present, t        he government maintains, and Adarand does not dispute, that SCCs are no longer in use. (        See Appellants' Supp. Br. Attach. 1.)

A discussion of the complex, cumbersome, and changing regulations promulgated pursuant to the foregoing statutes, as well as a more thorough summary both of the statutory framework itself and of the SCC, is incorporated as an Appendix to this opinion.  Otherwise, changes in the relevant portions of

---

[5]  The relevant statutes have remained unchanged in all respects material to this litigation from 1992 to the present, except as noted in the Appendix to this opinion.

the regulations and SCC are discussed in our application of the strict scrutiny standard that follows.

### III

In reviewing the district court's grant of summary judgment to Adarand, we employ our customary standard of review:

> We review a grant of a motion for summary judgment de novo, applying the same legal standard used by the district court. See Byers v. City of Albuquerque, 150 F.3d 1271, 1274 (10th Cir. 1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. See Byers, 150 F.3d at 1274.

McGarry v. Board of County Comm'rs, 175 F.3d 1193, 1198 (10th Cir. 1999). At the very outset, before immersing ourselves in the intricacies of the issues before us, we emphasize our substantial agreement with much of the district court's judgment as it pertains to the versions of the statutes and regulations in place in 1996. Insofar as the court's judgment does not exceed the proper scope of its review and with the significant caveat that we disagree both with the court's conclusion regarding the fatality in fact of strict scrutiny and with its ultimate result in light of the current version of the relevant regulations, we take the district court's view of the matter. And we share wholeheartedly its sentiment

that the time has come for this litigation to come to an end.     See Adarand IV , 965

F. Supp. at 1558.

## A.  Evolution of Strict Scrutiny Standards

The Supreme Court's declarations in the affirmative action area are

characterized by plurality and split opinions and by the overruling of precedent.

This fractured prism complicates the task of lower courts in both identifying and

applying an appropriate form of equal protection review.  We therefore begin our

analysis with a brief review of what we understand to be the current state of the

law in this area.

Twenty years ago, the Supreme Court addressed a direct precursor of the

statutes at issue today in     Fullilove , 448 U.S. at 448.  Although     Fullilove  failed to

produce a majority opinion, six Justices voted to affirm the program at issue—the

"minority business enterprise" ("MBE") provision of the Public Works

Employment Act of 1977, Pub. L. 95-28, 91 Stat. 116, § 103(f)(2).        See

Fullilove , 448 U.S.  at 453.  The MBE provision required that, subject to waiver

by the Secretary of Commerce, "no grant shall be made under this Act for any

local public works project unless the applicant gives satisfactory assurance to the

Secretary [of Commerce] that at least 10 per centum of the amount of each grant

shall be expended for minority business enterprises."        Id. at 454 (quoting 42

U.S.C. § 6705(f)(2) (1976 ed., Supp. II)).  For purposes of the MBE set-aside,

MBEs were defined as businesses owned and controlled by individuals who could be classified as "Negroes, Spanish-speaking, Oriental, Indians, Eskimos, and Aleuts." Id. (quoting 42 U.S.C. § 6705(f)(2)). The MBE program was a mandatory set-aside; under the relevant regulations, a request for waiver could be granted, among other circumstances, if a minority business enterprise quoted an "unreasonable" price. Id. at 470-71 (internal quotation and citation omitted).

Chief Justice Burger, joined by Justices White and Powell, applied what appears to be a more deferential standard than what the Court often terms "strict scrutiny":

> A program that employs racial or ethnic criteria, even in a remedial context, calls for close examination; yet we are bound to approach our task with appropriate deference to the Congress, a co-equal branch charged by the Constitution with the power to "provide for the . . . general Welfare of the United States' and 'to enforce, by appropriate legislation," the equal protection guarantees of the Fourteenth Amendment.

Id. at 472 (quoting U.S. Const., art. I, § 8, cl. 1); see also City of Richmond v. J.A. Croson Co., 488 U.S. 469, 487 (1989) (Op. of O'Connor, J.) ("The principal opinion in Fullilove, written by Chief Justice Burger, did not employ 'strict scrutiny' or any other traditional standard of equal protection review.").

Adarand III, 515 U.S. at 235, cast doubt on Fullilove. "[T]o the extent (if any) that Fullilove held federal racial classifications to be subject to a less rigorous standard, it is no longer controlling. But we need not decide today

whether the program upheld in Fullilove would survive strict scrutiny as our more recent cases have defined it." Id. We interpret that statement in Adarand III as precluding reliance on Fullilove for either the standard of review or the result in this case. Otherwise, the programs at issue here would almost certainly pass muster under the Fullilove standard because, in furtherance of substantially similar goals, the programs before us impose a significantly more flexible and less intrusive remedy—a voluntary subsidy as opposed to a fixed set-aside subject to waiver. [6]

In 1989 the Court produced a majority for a portion of an affirmative action opinion. See Croson, 488 U.S. at 469. In Croson, the Court struck down under strict scrutiny a municipal plan requiring "prime contractors to whom the city awarded construction contracts to subcontract at least 30% of the dollar

_____

[6] We note that the Adarand III Court's qualified repudiation of Fullilove would appear to leave in place other aspects of that case, most notably its factual determinations regarding congressional findings and the legislative history of the SBA discussed in the Chief Justice's opinion and further elaborated upon in the concurring opinion of Justice Powell. See Croson, 488 U.S. at 488 (Op. of O'Connor, J.) ("In reviewing the legislative history behind the Act, the principal opinion focused on the evidence before Congress that a nationwide history of past discrimination had reduced minority participation in federal construction grants." (citing Fullilove, 448 U.S. at 458-67 (Op. of Burger, C.J.)); id. at 489 (citing the concurring opinion of Powell, J., in Fullilove). Thus, where Fullilove's factual findings bear on the factual underpinnings of this case, we so note in the discussion that follows. The separate question of whether those findings are adequately supported by evidence, pursuant to Adarand III's application of Croson to federal race-conscious programs, is one we consider at length in Subsection B below.

amount of the contract to one or more [MBEs]." Id. at 477. In so doing, Justice O'Connor, joined by Chief Justice Rehnquist and Justice White, rejected the competing arguments that a state's power to remedy racial discrimination is equal to that of Congress under § 5 of the Fourteenth Amendment and that the Fourteenth Amendment effectively preempts state action in matters of race. See id. at 489-93 (Op. of O'Connor, J.). [7] A plurality of the Court then proceeded to reject the proposition that the level of scrutiny varies in cases of "benign" and invidious racial classifications, noting that black Americans constituted a controlling political majority in the city of Richmond, a fact militating against the application of a more deferential standard of review. Id. at 495-96 (Op. of O'Connor, J.).

What did produce a clear majority in Croson was the proposition that "the factual predicate offered in support of the Richmond Plan suffers from the two defects identified as fatal in Wygant [v. Jackson Board of Education, 476 U.S. 267 (1986)]," Croson, 488 U.S. at 498, namely, failure to make findings specific to the market to be addressed by the remedy and to provide limits to the scope of

---

[7] Despite overruling Metro Broadcasting and casting doubt on Fullilove, the majority opinion in Adarand III firmly rejected the suggestion "that any Member of this Court has repudiated in this case his or her previously expressed views on the subject" of Congress's powers under § 5 of the Fourteenth Amendment. Adarand III, 515 U.S. at 231.

that remedy due to only generalized findings of discrimination. [8] The Court stated that "[w]hile there is no doubt that the sorry history of both private and public discrimination in this country has contributed to a lack of opportunities for black entrepreneurs, this observation, standing alone, cannot justify a rigid racial quota in the awarding of public contracts in Richmond, Virginia." Id. at 499. In particular, the majority noted it was "sheer speculation" to simply guess how many firms there would be absent past discrimination and "[t]he 30% quota cannot in any realistic sense be tied to any injury suffered by anyone." Id.

After noting the City of Richmond's failure to link its remedial program to specifically identified past discrimination, the Croson majority made two additional observations explaining why the City's program was not narrowly tailored. See id. at 507. First, the Court noted "there does not appear to have been any consideration of the use of race-neutral means to increase minority

---

[8] Croson cannot be read, as Adarand would have it, as standing for the proposition that findings of "the present effects of past discrimination in the construction industry," 488 U.S. at 498 (citation omitted), are automatically insufficient to justify remedial action. This characterization of Croson overlooks a very significant difference between the Richmond Plan at issue in Croson and the congressional enactments at issue in the instant case. The City of Richmond had no authority to remedy the present effects of past discrimination in the entire construction industry nationally, and the City was not permitted to simply infer that congressional findings as to the entire industry applied equally to the particular market within its jurisdiction. See id. at 504-05. The remediation of nation-wide problems, however, is particularly within the purview of Congress, and findings of industry-wide discrimination are precisely what is relevant to a federal decision to undertake remedial action. See id. at 490, 504.

business participation in city contracting." Id. (citing United States v. Paradise, 480 U.S. 149, 171 (1987)). The Court suggested that race-neutral programs of municipal financing for small firms might increase minority participation without the use of a direct racial preference. See id.

Second, the Court declared "[t]he 30% quota cannot be said to be narrowly tailored to any goal, except perhaps outright racial balancing. It rests upon the 'completely unrealistic' assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population." Id. (quoting Sheet Metal Workers v. EEOC, 478 U.S. 421, 494 (1986) (O'Connor, J., concurring in part and dissenting in part)).

Adarand III, 515 U.S. at 235 (citing Fullilove, 448 U.S. at 496 (Powell, J., concurring)), followed and held that "[f]ederal racial classifications, like those of a State, must serve a compelling governmental interest, and must be narrowly tailored to further that interest." Now, informed by the Supreme Court's directives pertaining to remand, and its multifaceted jurisprudence on affirmative action programs, we turn to the task of assessing the application of racial presumptions in the SCC program under a strict scrutiny standard.

## B. Compelling Interest

We "decide the question [of] whether the interests served by the use of [SCCs] are properly described as 'compelling.'" Adarand III, 515 U.S. at 237.

-24-

In so doing, our inquiry necessarily consists of four parts:  First, we must determine whether the government's articulated goal in enacting the race-based measures at issue in this case is appropriately considered a "compelling interest" under the governing case law; if so, we must then set forth the standards under which to evaluate the government's evidence of compelling interest; third, we must decide whether the evidence presented by the government is sufficiently strong to meet its initial burden of demonstrating the compelling interest it has articulated; and finally, we must examine wether the challenging party has met its ultimate burden of rebutting the government's evidence such that the granting of summary judgment to either party is proper.  We begin, as we must, with an inquiry into the meaning of "compelling interest."

1.  "Compelling Interest" in Race-Conscious Measures Defined

We know from  Adarand III  that, as a general proposition, there may be a compelling interest that supports the enactment of race-conscious measures. Justice O'Connor explicitly states:  "The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it."   Adarand III , 515 U.S. at 237;   see also  Shaw v. Hunt , 517 U.S. 899, 909 (1996) (stating that "remedying the effects of past or present racial discrimination may in the proper case justify a government's use of racial

distinctions" (citing Croson, 488 U.S. at 498-506)). Interpreting Croson, we have recognized that "the Fourteenth Amendment permits race-conscious programs that seek both to eradicate discrimination by the governmental entity itself and to prevent the public entity from acting as a '"passive participant" in a system of racial exclusion practiced by elements of the local construction industry' by allowing tax dollars 'to finance the evil of private prejudice.'" Concrete Works of Colo., Inc. v. City & County of Denver, 36 F.3d 1513, 1519 (10th Cir. 1994) (quoting Croson, 488 U.S. at 492).

The government identifies the compelling interest at stake in the use of racial presumptions in the SCC program as "remedying the effects of racial discrimination and opening up federal contracting opportunities to members of previously excluded minority groups." (Appellants' Br. at 21.) The district court in Adarand IV, 965 F. Supp. at 1572, held this interest is properly described as compelling, reasoning that "it appears that Justice O'Connor's assertion in Croson, that Congress has the ability under Section 5 [of the Fourteenth Amendment] to recognize and address racial discrimination, has been left undisturbed." Although we decline to address the precise relationship between § 5 of the Fourteenth Amendment and the power of Congress, acting through the Executive branch, to address racial discrimination by the states, we readily conclude that the federal government has a compelling interest in not

-26-

perpetuating the effects of racial discrimination in its own distribution of federal funds and in remediating the effects of past discrimination in the government contracting markets created by its disbursements. See Croson, 488 U.S. at 492 (Op. of O'Connor, J.) ("It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice." (citing Norwood v. Harrison, 413 U.S. 455, 465 (1973))) ; Norwood, 413 U.S. at 463 ("That the Constitution may compel toleration of private discrimination in some circumstances does not mean that it requires state support for such discrimination.").

In its brief, Adarand cites general language from Adarand III in an attempt to limit the permissible scope of Congress's power to redress the effects of racial discrimination, ignoring the substantial differences between the scope of problems to be addressed by Congress and those to be addressed by a city council such as that in Croson. The fact that Congress's enactments must serve a compelling interest does not necessitate the conclusion that the scope of that interest must be as geographically limited as that of a local government. See Croson, 488 U.S. at 489 (Op. of O'Connor, J.). [9] Although there is not a clear

_____

[9] Contractors Association of Eastern Pennsylvania, Inc. v. City of Philadelphia, 6 F.3d 990 (3d Cir. 1993), cited by appellee, is distinguishable both
(continued...)

majority on the Court for the proposition that § 5 of the Fourteenth Amendment grants Congress broad remedial powers in the area of discrimination, in Section II of Justice O'Connor's opinion in Croson, Justice O'Connor and Chief Justice Rehnquist endorsed that proposition. See Croson, 488 U.S. at 490 ("That Congress may identify and redress the effects of society-wide discrimination does not mean that, a fortiori, the States and their political subdivisions are free to decide that such remedies are appropriate."). The geographic scope of Congress's reach in this regard is "society-wide" and therefore nationwide. See id.[10]

---

[9](...continued)
in that it involved a city-based rather than a nationwide program, and in that the program at issue was based on far scantier evidence than that available in the instant case.

[10] The parties and their respective amici curiae differ sharply as to the relevant geographical scope to be considered in assessing the government's basis in evidence for concluding that race-conscious remedial action is necessary. Adarand and its amici argue based on Croson for the necessity of findings regarding both discrimination and the availability of qualified DBEs in a particular local market as a necessary prerequisite to any government action. We disagree, concluding that the absence of such findings is more properly addressed in this case under the rubric of narrow tailoring. Quite apart from the question of Congress's power under § 5 of the Fourteenth Amendment left unresolved by the Adarand III majority, see Adarand III, 515 U.S. at 230-31, the compelling interests to be addressed by Congress, whether under the Commerce Clause, Spending Clause, or Fourteenth Amendment, are necessarily different in geographic scope than those properly addressed by a city. See, e.g., Croson, 488 U.S. at 505 (focusing on lack of "identified discrimination in the Richmond construction industry"); Concrete Works, 36 F.3d at 1520 (identifying "the six-county Denver Metropolitan Statistical Area" as one acceptable geographical
(continued...)

## 2. Evidence Required to Show Compelling Interest

While the government's articulated interest is compelling as a theoretical matter, we must yet determine whether the actual evidence proffered by the government supports the existence of past and present discrimination in the publicly-funded highway construction subcontracting market. Generally,

> [a]bsent searching judicial inquiry into the justification for . . . race-based measures, there is simply no way of determining what classifications are . . . in fact motivated by illegitimate notions of racial inferiority or simple racial politics. Indeed, the purpose of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant the use of a highly suspect tool.

Id. at 493 (Op. of O'Connor, J.); see also Shaw v. Reno, 509 U.S. 630, 643-44 (1993) ("A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification." (quoting Personnel Administrator of Mass. v. Feeney, 442 U.S. 256, 272 (1979)) (further citations omitted)).

---

[10](...continued)
region for inquiry into an affirmative action measure by the City and County of Denver). That said, Adarand's concern with the availability of DBEs in a particular market is certainly an important one, see Croson, 488 U.S. at 502, and, as discussed below, the lack of evidence provided by the government regarding local availability and the government's concomitant failure to tailor contracting regulations accordingly constitute one of the chief barriers to finding the previous statutory and regulatory scheme narrowly tailored.

Our "benchmark for judging the adequacy of the government's factual predicate for affirmative action legislation [i]s whether there exists a ' strong basis in evidence for [the government's] conclusion that remedial action was necessary.'" Concrete Works , 36 F.3d at 1521 (quoting Croson , 488 U.S. at 500 (quoting Wygant , 476 U.S. at 277 (plurality))) (emphasis in Concrete Works ). Both statistical and anecdotal evidence are appropriate in the strict scrutiny calculus, although anecdotal evidence by itself is not. See Concrete Works , 36 F.3d at 1520-21.

> Although Croson places the burden of production on the [government] to demonstrate a "strong basis in evidence" that its race- and gender-conscious contract program aims to remedy specifically identified past or present discrimination, the Fourteenth Amendment does not require a court to make an ultimate judicial finding of discrimination before [the government] may take affirmative steps to eradicate discrimination.

Id. at 1522 (citing Wygant , 476 U.S. at 292 (O'Connor, J., concurring)). After the government's initial showing, the burden shifts to Adarand to rebut that showing: "Notwithstanding the burden of initial production that rests" with the government, "[t]he ultimate burden [of proof] remains with [the challenging party] to demonstrate the unconstitutionality of an affirmative-action program." Id. (quoting Wygant , 476 U.S. at 277-78 (plurality)). "[T]he nonminority [challengers] . . . continue to bear the ultimate burden of persuading the court that [the government entity's] evidence did not support an inference of prior

-30-

discrimination and thus a remedial purpose." Id. at 1522-23 (quoting Wygant, 476 U.S. at 293 (O'Connor, J., concurring)).

In addressing the question of what evidence of discrimination supports a compelling interest in providing a remedy, we consider both direct and circumstantial evidence, including post-enactment evidence introduced by defendants as well as the evidence in the legislative history itself. See Concrete Works, 36 F.3d at 1521, 1529 n.23 (considering post-enactment evidence). [11] Furthermore, we may consider public and private discrimination not only in the specific area of government procurement contracts but also in the construction industry generally; thus, any findings Congress has made as to the entire construction industry are relevant. See id. at 1523, 1529; see also Croson, 488 U.S. at 492 (Op. of O'Connor, J.).

It is with the foregoing principles in mind that we turn to an examination of the evidentiary basis on which Congress relied to support its finding of discrimination and continuing effects of past discrimination against minorities in the publicly-funded and private construction industry.

---

[11] Post-enactment evidence is particularly relevant when, as here, it was gathered specifically to respond to the Supreme Court's Adarand III decision, which applied a new compelling interest standard to the federal government's affirmative action programs. See Appendix—The Compelling Interest for Affirmative Action in Federal Procurement, 61 Fed. Reg. 26,050 (1996) (noting purpose of responding to Adarand III).

3. Evidence in the Present Case

There can be no doubt that Congress repeatedly has considered the issue of discrimination in government construction procurement contracts, finding that racial discrimination and its continuing effects have distorted the market for public contracts—especially construction contracts—necessitating a race-conscious remedy. See, e.g. , Appendix—The Compelling Interest for Affirmative Action in Federal Procurement , 61 Fed. Reg. 26,050, 26,051-52 & nn.12-21 (1996) (" The Compelling Interest ") (citing approximately thirty congressional hearings since 1980 concerning minority-owned businesses). But the question is not merely whether the government has considered evidence, but rather the nature and extent of the evidence it has considered.

Of course, statements made with regard to discrimination in the subcontracting industry by congressional reports and by members of Congress are insufficient in themselves to support a finding of compelling interest. We must probe more deeply into the legislative history of the enactments at issue. We cannot merely recite statements made by members of Congress alleging a finding of discriminatory effects and the need to address those effects, such as the following:

> Where there are no DBE programs, women and minority-owned
> small businesses are shut out of the highway construction. The
> Federal DBE program serves to redress the inequality and redress the

unfortunate fact that all across the country women and minorities would not otherwise have access to construction contracts.

144 Cong. Rec. S1421 (March 5, 1998) (statement of Sen. Moseley-Braun). Such findings are not enough to satisfy strict scrutiny standards. See Croson, 488 U.S. at 500 ("[W]hen a legislative body chooses to employ a suspect classification, it cannot rest upon a generalized assertion as to the classification's relevance to its goals." (citing McLaughlin v. Florida, 379 U.S. 184, 190-92 (1964))). The question that Croson requires us to ask is whether there is a strong basis in evidence to support the legislature's conclusion.

In Concrete Works, we noted that

Neither Croson nor its progeny clearly state whether private discrimination that is in no way funded with public tax dollars can, by itself, provide the requisite strong basis in evidence necessary to justify a municipality's affirmative action program. A plurality in Croson simply suggested that remedial measures could be justified upon a municipality's showing that "it had essentially become a 'passive participant' in a system of racial exclusion practiced by elements of the local construction industry." Croson, 488 U.S. at 492. Although we do not read Croson as requiring the municipality to identify an exact linkage between its award of public contracts and private discrimination, such evidence would at least enhance the municipality's factual predicate for a race- and gender-conscious program.

Concrete Works, 36 F.3d at 1529. Unlike Concrete Works, the evidence presented by the government in the present case demonstrates the existence of two kinds of discriminatory barriers to minority subcontracting enterprises, both of which show a strong link between racial disparities in the federal

-33-

government's disbursements of public funds for construction contracts and the channeling of those funds due to private discrimination. The first discriminatory barriers are to the formation of qualified minority subcontracting enterprises due to private discrimination, precluding from the outset competition for public construction contracts by minority enterprises. The second discriminatory barriers are to fair competition between minority and non-minority subcontracting enterprises, again due to private discrimination, precluding existing minority firms from effectively competing for public construction contracts. The government also presents further evidence in the form of local disparity studies of minority subcontracting and studies of local subcontracting markets after the removal of affirmative action programs. Discussion of each of those bodies of evidence follows. [12]

    a. Barriers to Minority Business Formation in Construction Subcontracting

---

[12] In the discussion that follows, we take judicial notice of the content of hearings and testimony before the congressional committees and subcommittees cited by the government. Furthermore, we note in passing that there is an even more substantial body of legislative history supporting the compelling interest in the present case than that cited by the government. See, e.g. , Barriers to Full Minority Participation in Federally Funded Highway Contracts: Hearing Before a Subcomm. of the House Comm. on Gov't Operations , 100th Cong. (April 1, 1998); Problems Facing Minority and Women-Owned Small Businesses in Procuring U.S. Government Contracts: Hearing Before the Commerce, Consumer, & Monetary Affairs Subcomm. of the House Comm. on Gov't Operations , 103d Cong. (July 12, 1993).

As to the first kind of barrier, the government's evidence consists of numerous congressional investigations and hearings as well as outside studies of statistical and anecdotal evidence—cited and discussed in The Compelling Interest , 61 Fed. Reg. 26,054-58—and demonstrates that discrimination by prime contractors, unions, and lenders has woefully impeded the formation of qualified minority business enterprises in the subcontracting market nationwide.

The evidence demonstrates that prime contractors in the construction industry often refuse to employ minority subcontractors due to "old boy" networks—based on a familial history of participation in the subcontracting market—from which minority firms have traditionally been excluded. See H.R. Rep. 103-870 15 n.36 (1994) ("[T]he construction industry is . . . family dominated. Many firms are in their second or third generation operating structures. Minorities and women, unless they are part of construction families, have been and will continue to be excluded whenever possible."); The Meaning and Significance for Minority Business of the Supreme Court Decision in the City of Richmond v. J.A. Croson: Hearing Before the Legislative & Nat'l Sec. Subcomm. of the House Comm. on Gov't Operations, 100th Cong. 111 (1990) ("The Significance of Croson") (statement of Manuel Rodriguez, President, R&D Development, Inc., specializing in mechanical construction, and past president and founder of the National Hispanic Association of Construction Enterprises)

-35-

("[F]ew [minorities] today have families from whom they can inherit a construction business."); see also Minority Business Development Program Reform Act of 1987: Hearings on S. 1993 & H.R. 1807 Before the Senate Comm. on Small Bus. , 100th Cong. 127 (1988) (statement of Parren Mitchell, Chairman, Minority Business Enterprise Legal Defense and Education Fund) (noting the "harsh reality" of the "old-boy network" that prevents minority-owned firms from breaking into the private sector); H.R. Rep. No. 103-870 15 & n.36 (1994) (discussing evidence of the discriminatory exclusion of minority firms from business networks); The Compelling Interest, 61 Fed. Reg. at 26,057 & nn.82-83 (citing studies explaining minorities' exclusion from the construction trades as a result of the lack of familial connections).

Furthermore, subcontractors' unions place before minority firms a plethora of barriers to membership, thereby effectively blocking them from participation in a subcontracting market in which union membership is an important condition for success. See Minority Business Participation in Department of Transportation Project: Hearing Before a Subcomm. of the House Comm. on Gov't Operations, 99th Cong. 203 (1985) (testimony of James Haughton, President, Fight Back) (minority contractors continue to "suffer[] very heavily because they have been victims to that discrimination as practiced by the unions"); The Significance of Croson at 117-19 (statement of Manuel Rodriguez) (describing the way in which

-36-

union discrimination prevents access to skills and experience needed to form a business); The Compelling Interest, 61 Fed. Reg. at 26,055-56 & nn.53 & 62 (citing studies of statistical and anecdotal evidence finding racism by construction trade unions in several cities and states and concluding that racism is a major cause of the lack of minority business formation in the construction industry).

The government's evidence is particularly striking in the area of the race-based denial of access to capital, without which the formation of minority subcontracting enterprises is stymied.     See, e.g. , Availability of Credit to Minority-Owned Small Businesses: Hearing Before the Subcomm. on Fin. Insts. Supervision, Regulation & Deposit Ins. of the House Comm. on Banking, Fin. & Urb. Affs. , 103d Cong. 19-20 (1994) (statement of Toni Hawkins, Executive Director, National Black Business Counsel) (noting the existence and examples of discrimination in business lending);     id. at 27 (statement of Wayne Smith, Chairperson, Black Urban Alliance: African American Chamber of Commerce of Newark, NJ) (stating that while perhaps more subtle than discrimination in mortgage lending, discrimination in business lending exists);     id. at 209 (statement of M. Harrison Boyd, President/CEO, HBA Management Services Group, Inc.) (White bank employees "have been, and are continually, programmed to perceive minority business loans as bad business, and/or at a minimum, risky and less desirable."); H.R. Rep. No. 103-870 7 (1994) ("There is a widespread reluctance

on the part of the commercial banking, venture capital, . . . and capital markets to take the same risk with a [minority] entrepreneur that they would readily do with a white one." (quoting testimony of Sherman Copelin, President of the National Business League));  Disadvantaged Business Set-Asides in Transportation Construction Projects: Hearing Before the Subcomm. on Procurement, Innovation, and Minority Enter. Dev. of the House Comm. on Small Bus. , 100th Cong. 26 (1988) (statement of Joann Payne, President, PSM Consultants) ("[B]ecause of the ethnic and sex discrimination practiced by lending institutions, it was very difficult for minorities and women to secure bank loans. . . ."); The Disadvantaged Business Enterprise Program of the Federal-Aid Highway Act: Hearing Before the Subcomm. on Transp. of the Senate Comm. on Env't & Pub. Works , 99th Cong. 363 (1985) (statement of James K. Laducer, Director, North Dakota Minority Business Enterprise Programs, United Tribes Educational Technical Center) (North Dakota banks "refuse to lend monies to minority businesses from nearby Indian communities."); Fiscal Economic & Social Crises Confronting American Cities: Hearings Before the Senate Comm. on Banking, Housing, & Urb. Affs. , 102d Cong. 431 (1992) (statement of Anthony Robinson, President, Minority Business Enterprise Legal Defense and Education Fund) ("[T]he legitimate capital needs of the minority business community are ignored or held to such a higher underwriting standard and systematically denied venture

capital."); Federal Minority Business Programs: Hearing Before the House Comm. on Small Bus. , 102d Cong. 89 (1991) (statement of Joshua I. Smith, Chairman, U.S. Commission on Minority Business Development) (attaching Interim Report 1990 of the United States Commission of Minority Business Development, which states minority business owners' "access to credit ha[s] been historically limited"); Minority Construction Contracting: Hearing Before the Subcomm. on SBA, the Gen. Econ. & Minority Enter. Dev. of the House Comm. on Small Bus. , 101 Cong. 26 (1989) (statement of Cleveland M. Chapman, President, Midwest Contractors For Progress) (citing statistics demonstrating discrimination in lending in Chicago). For example, "[t]he average loan to a black-owned construction firm is $49,000 less than the average loan to an equally matched nonminority construction firm." The Compelling Interest , 61 Fed. Reg. at 26,058 & n.91 (citing Grown & Bates, Commercial Bank Lending Practices & the Development of Black-Owned Construction Companies. , 14 J. Urb. Aff. at 34 (1992)). "All other factors being equal, a black business owner is approximately 15 percent less likely to receive a business loan than a white owner." Id. at 26,058 & n.90 (citing Faith Ando, Capital Issues and the Minority-Owned Business , 16 Rev. Black Pol. Econ. at 97 (1988)). Another study

> surveyed 407 business owners in the Denver area. It found that
> African Americans were 3 times more likely to be rejected for
> business loans than whites. The denial rate for Hispanic owners was
> 1.5 times as high as white owners. Disparities in the denial rate

remained significant even after controlling for other factors that may affect the lending rate, such as the size and net worth of the business. The study concluded that "despite the fact that loan applicants of three different racial/ethnic backgrounds in this sample (Black, Hispanic and Anglo) were not appreciably different as businesspeople, they were ultimately treated differently by the lenders on the crucial issue of loan approval or denial."

Id. at 26,058 (footnotes omitted) (citing The Colorado Center for Community Development, University of Colorado at Denver, Survey of Small Business Lending in Denver v (1996)). Such findings strongly support an initial showing of discrimination in lending; and we take judicial notice of the obvious causal connection between access to capital and ability to implement public works construction projects. [13]

b. Barriers to Competition by Existing Minority Enterprises

With regard to barriers faced by existing minority enterprises, the government presents evidence tending to show that discrimination by prime contractors, private sector customers, business networks, suppliers, and bonding companies fosters a decidedly uneven playing field for minority subcontracting enterprises seeking to compete in the area of federal construction subcontracts.

---

[13] Lending discrimination alone of course does not justify action in the construction market. See Croson, 488 U.S. at 510 (Op. of O'Connor, J.) (noting a municipality's alternative remedy of taking direct action against discrimination in the provision of credit). However, the persistence of such discrimination, which is already unlawful under federal law, supports the assertion that the formation, as well as utilization, of minority-owned construction enterprises has been impeded.

-40-

The government presents powerful evidence that

> [a]ll too often, contracting remains a closed network, with prime contractors maintaining long-standing relationships with subcontractors with whom they prefer to work.  Because minority owned firms are new entrants to most markets, the existence and proliferation of these relationships locks them out of subcontracting opportunities.  As a result, minority-owned firms are seldom or never invited to bid for subcontracts on projects that do not contain affirmative action   requirements.

The Compelling Interest   , 61 Fed. Reg. 26,058 & nn.98-99 (footnotes omitted) (citing studies of statistical and anecdotal evidence of minority business participation in state and local construction industries).      The government has also presented sobering evidence that

> when minority firms are permitted to bid on subcontracts, prime contractors often resist working with them.  This sort of exclusion is often achieved by white firms refusing to accept low minority bids or by sharing low minority bids with another subcontractor in      order to allow that business to beat the bid (a practice known as "bid shopping").

Id. at 26,058-59 (citing studies of statistical and anecdotal evidence detailing bid shopping in several localities).

It is clear to us that Congress has devoted considerable energy to investigating and considering this systematic exclusion of existing minority enterprises from opportunities to bid on construction projects       resulting from the insularity and sometimes outright racism of the non-minority firms in the construction industry.   See, e.g. , How State and Local Governments Will Meet the

Croson Standard (Minority Set-Asides): Hearing Before the Subcomm. on Civ. & Const. Rights of the House Comm. on the Judiciary, 100th Cong. 53-54 (1989) (statement of Marc Bendick, Bendick & Egan Economic Consultants, Inc.) ("[W]e must not for a moment underestimate the role of continuing pervasive blunt discrimination by the private market. . . . The same prime contractor who will use a minority subcontractor on a city contract and will be terribly satisfied with the firm's performance, will simply not use that minority subcontractor on a private contract where the prime contractor is not forced to use a minority firm."); The Significance of Croson at 121-22 (statement of Manuel Rodriguez); id. at 104-06 (statement of E.R. Mitchell, Jr., President of E.R. Mitchell Construction Company and President of the Atlanta Chapter of the National Association of Minority Contractors) (identifying racially discriminatory actions by federal and state government agencies in the bidding process on construction contracts).

The government's evidence strongly supports the thesis that informal, racially exclusionary business networks dominate the subcontracting construction industry, shutting out competition from minority firms. See, e.g., The Significance of Croson at 107 (statement of E.R. Mitchell, Jr.) ("[Q]ualified black firms are outside the business network of established white firms. By virtue of being outsiders to their communications loop, it is impossible to successfully bid because we remain forever strangers to white owners and developers."); The

Compelling Interest, 61 Fed. Reg. at 26,059-60 & nn.107, 109-110 (citing studies and articles on statistical and anecdotal evidence demonstrating discriminatory treatment in the bidding process).

Minority subcontracting enterprises in the construction industry find themselves unable to compete with non-minority firms on an equal playing field due to racial discrimination by bonding companies, without whom those minority enterprises cannot obtain subcontracting opportunities. The government presents evidence both that bonding is an essential requirement of participation in federal subcontracting procurement, see The Compelling Interest, 61 Fed. Reg. at 26,060 (citing 40 U.S.C. §§ 270a-270e), and a "vicious circle" whereby minority subcontractors cannot obtain bonding due to lack of experience, and "since they cannot get bonding, they cannot get experience," The Compelling Interest, 61 Fed. Reg. at 26,060 (footnote omitted). Minority Business Participation in Department of Transportation Project: Hearing Before a Subcomm. of the House Comm. on Gov't Operations, 99th Cong., 1st Sess. 159 (1985) (statement of Sherman Brown, President, MCAP, Inc.) ("Virtually everyone connected with the minority contracting industry . . . apparently agrees that surety bonding is one of the biggest obstacles in the development of minority firms."). The government additionally presents evidence of an insular "old-boy" network in bonding that excludes minority firms. See, e.g., H.R. Rep. No. 103-870 at 15 & n.36. There is

also strong evidence of overt racial discrimination in the bonding market. See, e.g., Discrimination in Surety Bonding: Hearing Before the Subcomm. on Minority Enter., Fin. & Urb. Dev. of the House Comm. on Small Bus., 103d Cong. 2 (1993) (statement of John B. Cruz, III, President, John B. Cruz Construction Co.) (describing racial discrimination his company suffered in its efforts to obtain bonding); City of Richmond v. J.A. Croson: Impact and Response: Hearing Before the Subcomm. on Urb. & Minority-Owned Bus. Dev. of the Senate Comm. on Small Bus., 101st Cong. 40-41, 43 (1990) (statement of Andrew Brimmer, President, Brimmer and Company, Inc., Economic and Financial Consultants) (presenting the results of a study showing discrimination in bonding faced by African-American, Hispanic, and Pacific-Islander-owned firms in the Atlanta area); id. at 165-66 (statement of Edward W. Bowen, Project Administrator, Prentiss Properties, Ltd.) (noting that unclear bonding standards permit denials of bonding that are arbitrary and capricious and racially-biased); Disadvantaged Business Set-Asides in Transportation Construction Projects, supra, at 107 (statement of Marjorie L. Herter, National President, Women Construction Owners & Executives, USA; President, Vee See Construction Co.) ("Discrimination against women and minorities in the bonding market is quite prevalent."); The Compelling Interest, 61 Fed. Reg. at 26060 & n.118 (citing studies of statistical and anecdotal evidence of widespread racial discrimination in

bonding). For example, the government cites a Louisiana study according to which "minority firms were nearly twice as likely to be rejected for bonding, three times more likely to be rejected for bonding for over $1 million, and on average were charged higher rates for the same bonding policies than white firms with the same experience level," The Compelling Interest, 61 Fed. Reg. at 26,060 & n.119 (citing D.J. Miller & Associates, 2 State of Louisiana Disparity Study at 35-57 (1991)), while an Atlanta study found similarly glaring disparities in the ability of minority versus non-minority construction firms to obtain bonding generally and "unlimited bonding" in particular, Andrew F. Brimmer & Ray Marshall, Public Policy and Promotion of Minority Economic Development: City of Atlanta and Fulton County, Georgia at 19-20 (1990) (cited in City of Richmond v. J.A. Croson: Impact and Response: Hearing Before the Subcomm. on Urb. & Minority-owned Bus. Dev. of the Sen. Comm. on Small Bus., 101st Cong. 193-94 (1990)).

Finally, the government presents evidence of discrimination by suppliers, the result of which is that nonminority subcontractors receive special prices and discounts from suppliers not available to minority subcontractors, driving up "anticipated costs, and therefore the bid, for minority-owned businesses." Id. at 26,061; see also id. at n.123 (citing studies detailing discrimination by suppliers); The Significance of Croson at 106 (statement of E.R. Mitchell, Jr.) ("[C]ommon

-45-

suppliers working on projects routinely give white subs better prices for materials than they do black subs.").

Contrary to Adarand's contentions, on the basis of the foregoing survey of evidence regarding minority business formation and competition in the subcontracting industry, the government's evidence as to the kinds of obstacles minority subcontracting businesses face constitutes a strong basis for the conclusion that those obstacles are not "the same problems faced by any new business, regardless of the race of the owners."  (Appellee's Br. at 28.)

c.  Local Disparity Studies

Following the Supreme Court's decision in Croson, numerous state and local governments have undertaken statistical studies to assess the disparity, if any, between availability and utilization of minority-owned businesses in government contracting.  See The Compelling Interest, 61 Fed. Reg. at 26,061-62 (presenting the Urban Institute's analysis of thirty-nine disparity studies); see also 144 Cong. Rec. S5413-14 (May 22, 1998) (statement of Senator Chafee) (discussing a disparity study conducted for CDOT that found "a disproportionately small number of . . . minority-owned contractors participating in Colorado's transportation construction industry . . . .  Hispanic firms received less than one-half of one percent (.26%). . . .  The vast majority of contracts—more than 99 percent—went to firms owned by white men.").  The

government's review of those studies reveals that although such disparity was least glaring in the category of construction subcontracting, even in that area "minority firms still receive only 87 cents for every dollar they would be expected to receive" based on their availability. The Compelling Interest, 61 Fed. Reg. at 26,062. In that regard, the Croson majority stated that "[w]here there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the [government] or the [government's] prime contractors, an inference of discriminatory exclusion could arise." 488 U.S. at 509 (Op. of O'Connor, J.) (citations omitted). We are certainly mindful that "where special qualifications are necessary, the relevant statistical pool for purposes of demonstrating discriminatory exclusion must be the number of minorities qualified to undertake the particular task." Id. at 501-02. But here, we are unaware of such "special qualifications" aside from the general qualifications necessary to operate a construction subcontracting business. At a minimum, the disparity indicates that there has been under-utilization of the existing pool of minority subcontractors; and there is no evidence either in the record on appeal or in the legislative history before us that those minority subcontractors who have been utilized have performed inadequately or otherwise demonstrated a lack of necessary qualifications.

The disparity between minority DBE availability and market utilization in the subcontracting industry raises an inference that the various discriminatory factors the government cites have created that disparity. In Concrete Works , we stated that "[w]e agree with the other circuits which have interpreted Croson impliedly to permit a municipality to rely . . . on general data reflecting the number of MBEs and WBEs in the marketplace to defeat the challenger's summary judgment motion," and we do not see Adarand III as requiring any different standard in the case of an analogous suit against the federal government. 36 F.3d at 1528. [14] Although the government's aggregate figure of a

_____

[14] We reject the decidedly vague urgings of Adarand's amici curiae to reject disparity studies generally as biased and/or insufficiently reliable. Certainly, the conclusions of virtually all social scientific studies may be cast into question by criticism of their choice of assumptions and methodologies. The very need to make assumptions and to select data sets and relevant variables precludes perfection in empirical social science. However, general criticism of disparity studies, as opposed to particular evidence undermining the reliability of the particular disparity studies relied upon by the government, is of little persuasive value and neither compels us to discount the disparity evidence presented in the government's appendix nor does it create "a legitimate factual dispute about the accuracy of [the government's] data." Concrete Works , 36 F.3d at 1528 (refusing to grant summary judgment because of a legitimate factual dispute about the accuracy of disparity study data). Moreover, a generalized assertion that disparity studies lack reliability is in conflict with Croson , which suggests that disparity studies are entirely relevant to an assessment of whether sufficiently strong evidence exists to support a compelling interest in a race-conscious remedy. See 488 U.S. at 501; Concrete Works , 36 F.3d at 1528 ("[O]nce credible information about the size or capacity of the firms is introduced in the record, it becomes a factor that the court should consider.").

Adarand and its amici curiae misinterpret the case law they cite for the

(continued...)

-48-

13% disparity between minority enterprise availability and utilization is not

[14](...continued)
proposition that disparity studies are invalid. For example, with regard to Coral Construction Co. v. King City, 941 F.2d 910, 921 (9th Cir. 1991), we agree with the Ninth Circuit that the challengers of a DBE program should have the opportunity to rebut statistical evidence. In the present case, Adarand has had such an opportunity both in the district court below, see Adarand IV, 965 F. Supp. at 1573-77, and before this Court on appeal, but has failed to present a rebuttal other than an unfocused attack on disparity studies generally. Relying on Coral Construction Co., Adarand's amici further argue the disparity studies were not introduced into evidence and not rebutted; however, the amici do not, and presumably cannot, cite the portion of the record where Adarand objected on that ground to the introduction of the studies via The Compelling Interest, 61 Fed. Reg. 26,050, and their objection has been waived. See Lopez v. Behles (In re Am. Ready Mix, Inc.), 14 F.3d 1497, 1502 (10th Cir. 1994) (holding that where the appellant did not show, and the court of appeals could not find, where the issue was raised in the trial court below, the issue was not properly before the court of appeals and would not be considered); Walker v. Mather (In re Walker), 959 F.2d 894, 896 (10th Cir. 1992) (holding that as a general rule, the court of appeals will not consider an issue that was not raised below). As for Associated General Contractors of California, Inc. v. Coalition for Economic Equity, 950 F.2d 1401, 1416 (9th Cir. 1991), the court in that case held the statistical evidence presented was sufficient on the facts to establish compelling interest. Contractors Association of Eastern Pennsylvania, 6 F.3d at 1005, stated that "[d]isparity indices are highly probative evidence of discrimination." On further appeal in that case, the Third Circuit stated that whether disparity studies provided the requisite strong basis in evidence for upholding the race-conscious program at issue was a "close call" but did not decide the question. Contractors Ass'n of E. Penn, Inc. v. City of Philadelphia, 91 F.3d 586, 605 (3d Cir. 1996). Finally, Engineering Contractors Association of South Florida, Inc. v. Metropolitan Dade County, 122 F.3d 895, 903-05, 924 (11th Cir. 1997), can be distinguished on the grounds that the court of appeals affirmed the district court's factual findings which rejected evidence from disparity studies under the deferential "clear error" standard of review. Here the district court committed no clear error in its finding of compelling interest based on the statistical evidence before it. To the extent the foregoing cases may be otherwise interpreted, we reject their holdings.

overwhelming evidence, it is significant.  It is made more significant yet by the evidence showing that discriminatory factors discourage both enterprise formation of minority businesses and utilization of existing minority enterprises in public contracting.  Of course, it would be "sheer speculation" to even attempt to attach a particular figure to the hypothetical number of minority enterprises that would exist without discriminatory barriers to minority DBE formation. Croson , 488 U.S. at 499.  However, the existence of evidence indicating that the number of minority DBEs would be significantly (but unquantifiably) higher but for such barriers is nevertheless relevant to the assessment of whether a disparity is sufficiently significant to give rise to an inference of discriminatory exclusion. [15]

d.  Results of Removing Affirmative Action Programs

We take notice of an additional source of evidence of the link between compelling interest and remedy.  There is ample evidence that when race-conscious public contracting programs are struck down or discontinued, minority

---

[15]  Based on a comprehensive review of 1987 census data showing disproportionately low minority business ownership and receipts for minority-owned business, the U.S. Commission on Minority Business Development concluded that "minorities are not underrepresented in business because of choice or chance.  Discrimination and benign neglect is the reason why our economy has been denied access to this vital resource."  United States Commission on Minority Business Development,    Final Report  60 (1992).

business participation in the relevant market drops sharply or even disappears. See, e.g., 144 Cong. Rec. S1421 (March 5, 1998) (statement of Sen. Moseley-Braun) (citing statistics); The Compelling Interest, 61 Fed. Reg. 26,062 & nn.130-134 (citing studies). Although that evidence standing alone is not dispositive, it strongly supports the government's claim that there are significant barriers to minority competition in the public subcontracting market, raising the specter of racial discrimination. "Where there is a significant statistical disparity between the number of qualified minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise." Croson, 488 U.S. at 509 (Op. of O'Connor, J.) (citations omitted).

In sum, on the basis of the foregoing body of evidence, we conclude that the government has met its initial burden of presenting a "strong basis in evidence" sufficient to support its articulated, constitutionally valid, compelling interest. Croson, 488 U.S. at 500 (quoting Wygant, 476 U.S. at 277).

4. Adarand's Rebuttal

Adarand and the amici curiae supporting it have utterly failed to meet their "ultimate burden" of introducing credible, particularized evidence to rebut the government's initial showing of the existence of a compelling interest in

remedying the nationwide effects of past and present discrimination in the federal construction procurement subcontracting market. [16] Concrete Works, 36 F.3d at 1522 (quoting Wygant, 476 U.S. at 277). Its assertions as to the general impermissibility of a race-conscious remedy regardless of the compelling interest identified by Congress are not in accordance with equal protection jurisprudence. It is simply an untenable interpretation of Equal Protection Doctrine to insist that the Constitution requires Congress to acquiesce in the workings of an ostensibly free market that would direct the profits to be gleaned from disbursements of public funds to non-minorities alone. See Concrete Works, 36 F.3d at 1519 ("[T]he Fourteenth Amendment permits race-conscious programs that seek . . . to prevent the public entity from acting as a '"passive participant" in a system of racial exclusion . . .' by allowing tax dollars 'to finance the evil of private prejudice.'" (quoting Croson, 488 U.S. at 492)); see also Adarand III, 515 U.S. at 237 ("The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it.").

---

[16] We disagree with Adarand's contention that the government's "Appendix I" to its motion for summary judgment (Appellants' App. at 44-53) is insufficient evidence of Congress's findings. The Appendix references and discusses the long and comprehensive legislative history and findings on discrimination in the nationwide construction contracting market. Adarand's challenge to that history is too conclusory to meet its burden under Concrete Works.

We reject Adarand's characterization of various congressional reports and findings as conclusory and its highly general criticism of the methodology of numerous "disparity studies" cited by the government and its amici curiae as supplemental evidence of discrimination. [17] The evidence cited by the government and its amici curiae and examined in this opinion only reinforces the conclusion that "racial discrimination and its effects continue to impair the ability of minority-owned businesses to compete in the nation's contracting markets." The Compelling Interest, 62 Fed. Reg. at 26,062. In Concrete Works, 36 F.3d at 1530-31, the plaintiff "specifically identified" and "put forth evidence" showing "flaws" in the data justifying the City of Denver's affirmative action program, thus precluding summary judgment on the issue of compelling interest. Here, by contrast, the government's evidence permits a finding that as a matter of law Congress has the requisite strong basis in evidence to take action to remedy racial

---

[17] Adarand III called into question Fullilove's standard of review and possibly its result. However, as far as we can ascertain, nothing in Adarand III undermines the conclusion of the lead Fullilove opinion that "Congress had abundant evidence from which it could conclude that minority businesses have been denied effective participation in public contracting opportunities by procurement practices that perpetuated the effects of prior discrimination." Fullilove, 448 U.S. at 477-78 (Op. of Burger, C.J.); see also Croson, 488 U.S. at 504 ("[In the Fullilove case,] Congress was exercising its powers under § 5 of the Fourteenth Amendment in making a finding that past discrimination would cause federal funds to be distributed in a manner which reinforced prior patterns of discrimination . . . . Congress has made national findings that there has been societal discrimination in a host of fields.").

discrimination and its lingering effects in the construction industry. This evidence demonstrates that both the race-based barriers to entry and the ongoing race-based impediments to success faced by minority subcontracting enterprises—both discussed above—are caused either by continuing discrimination or the lingering effects of past discrimination on the relevant market. Furthermore, Congress is not limited to simply proscribing federal discrimination against minority contractors, as it has obviously already done. The Constitution does not obligate Congress to stand by idly and continue to pour money into an industry so shaped by the effects of discrimination that the profits to be derived from congressional appropriations accrue exclusively to the beneficiaries, however personally innocent, of the effects of racial prejudice. [18]

---

[18] We likewise reject Adarand's contention that Congress must make specific findings regarding discrimination against every single sub-category of individuals within the broad racial and ethnic categories designated by statute and addressed by the relevant legislative findings. If Congress has valid evidence, for example that Asian-American individuals are subject to discrimination because of their status as Asian-Americans, it makes no sense to require sub-findings that subcategories of that class experience particularized discrimination because of their status as, for example, Americans from Bhutan. "Race" is often a classification of dubious validity—scientifically, legally, and morally. We need not impart excess legitimacy to racial classifications by taking notice of the harsh fact that racial discrimination commonly occurs along the lines of the broad categories identified: "Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities." 15 U.S.C. § 637(d)(3)(C).

The evidence at issue is not, as Adarand would have it, merely evidence of generalized societal discrimination. See Wygant, 476 U.S. at 276 (Op. of Powell,
(continued...)

We do not intend to suggest that the evidence cited by the government is unrebuttable. We merely point out that under our precedent it is for Adarand to rebut that evidence, and it has not done so to the extent required to raise a genuine issue of material fact as to whether the government has met its evidentiary burden. We reiterate that "[t]he ultimate burden [of proof] remains with [the challenging party] to demonstrate the unconstitutionality of an affirmative-action program." Id. at 1522 (quoting Wygant, 476 U.S. at 277-78 (plurality)). "[T]he nonminority [challengers] . . . continue to bear the ultimate burden of persuading the court that [the government entity's] evidence did not support an inference of prior discrimination and thus a remedial purpose." Id. (quoting Wygant, 476 U.S. at 293 (O'Connor, J., concurring)). Because Adarand has failed utterly to meet its burden, the government's initial showing stands.

In sum, guided by Concrete Works, we conclude that the evidence cited by the government and its amici, particularly that contained in The Compelling Interest, 61 Fed. Reg. 26,050, more than satisfies the government's burden of production regarding the compelling interest for a race-conscious remedy.

---

[18](...continued)
J.) ("Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy."). Rather, it is evidence of specific barriers to market entry and fair competition facing actual and potential minority participants in the market for public construction contracts. In short, the construction contracting market is overwhelmingly composed of non-minorities due to the effects of racial discrimination.

Congress has a compelling interest in eradicating the economic roots of racial discrimination in highway transportation programs funded by federal monies. We therefore affirm the district court's finding of a compelling interest.

## C. Narrow Tailoring

We turn now to the question of narrow tailoring. Here, again, we must first define "narrow tailoring" for purposes of strict scrutiny and then determine whether the SCC program in the present case falls within that definition.

1. "Narrow Tailoring" in Race-conscious Programs Defined

We are guided in our inquiry by the handful of Supreme Court cases that have applied the narrow-tailoring analysis to government affirmative action programs. In applying strict scrutiny to a court-ordered program remedying the failure to promote black police officers, a plurality of the Court stated that

> [i]n determining whether race-conscious remedies are appropriate, we look to several factors, including the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties.

Paradise , 480 U.S. at 171 (1986) (plurality op. of Brennan, J.) (citations omitted). Regarding flexibility, "the availability of waiver" is of particular importance. Id. As for numerical proportionality, Croson admonishes us to beware of the "completely unrealistic assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population." 488 U.S.

at 507 (quoting Sheet Metal Workers , 478 U.S. at 494 (O'Connor, J., concurring in part and dissenting in part)).  In that context, a "rigid numerical quota" particularly disserves the cause of narrow tailoring.  Id. at 508. [19]  Finally, as for burdens imposed on third parties, a plurality of the Court in Wygant stated:

> As part of this Nation's dedication to eradicating racial discrimination, innocent persons may be called upon to bear some of the burden of the remedy.  "When effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, such a 'sharing of the burden' by innocent parties is not impermissible."

476 U.S. at 280-81 (Op. of Powell, J.) (quoting Fullilove , 448 U.S. at 484 (plurality)) (further quotations and footnote omitted).  We are guided by that benchmark.

Justice O'Connor's majority opinion in Croson adds a further factor to our analysis: under- or over-inclusiveness of the DBE classification.  In Croson , the Supreme Court struck down an affirmative action program as insufficiently narrowly tailored in part because "there is no inquiry into whether or not the

---

[19]  While Paradise only assumed without deciding that strict scrutiny is the appropriate standard, see 480 U.S. at 166-67 (plurality), it nevertheless applied strict scrutiny to affirm a race-conscious relief measure, see id. at 185-86. Although the Paradise factors require some modification in order to be used for evaluating the nationwide legislative enactment and its implementing regulations and programs at issue here (as opposed to a judicial order aimed at a particular police department) , they provide some general guidance on questions the Court considers relevant to the narrow tailoring inquiry.  See also Adarand III , 515 U.S. at 237 (citing the opinions of Justices Brennan, Stevens, and O'Connor in Paradise "to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact'" (quoting Fullilove , 448 U.S. at 519 (Marshall, J., concurring))).

particular MBE seeking a racial preference has suffered from the effects of past discrimination . . . . [T]he interest in avoiding the bureaucratic effort necessary to tailor remedial relief to those who truly have suffered from the effects of prior discrimination cannot justify a rigid line drawn on the basis of a suspect classification." Croson , 488 U.S. at 508 (citation omitted). Thus, we must be especially careful to inquire into whether there has been an effort to identify worthy participants in DBE programs or whether the programs in question paint with too broad—or too narrow—a brush.

More specific guidance is found in Adarand III . In remanding for strict scrutiny, the Court identified two questions apparently of particular importance in the instant case: (1) "[c]onsideration of the use of race-neutral means;" and (2) "whether the program [is] appropriately limited [so as] not to last longer than the discriminatory effects it is designed to eliminate." Adarand III , 515 U.S. at 237-38 (internal quotations and citations omitted). We thus direct our attention to an analysis of the program in light of Adarand III 's specific questions on remand, and the foregoing narrow-tailoring factors, in the following order: (1) the availability of race-neutral alternative remedies; (2) limits on the duration of the SCC and DBE certification programs; (3) flexibility; (4) numerical proportionality; (5) the burden on third parties; and (6) over- or under-inclusiveness.

-58-

## 2. Race-neutral Alternative Remedies

The first factor to be considered is that of the availability of alternative remedies to the race-conscious measures at issue. The district court in Adarand IV found, and Adarand does not challenge its finding, that Congress over a period of decades attempted to correct by race-neutral means the problem of too few minority subcontractors for government construction contracts, and only after it continued to find discriminatory effects did it first implement a race-conscious remedy. See Adarand IV, 965 F. Supp. at 1582-83; see also Croson, 488 U.S. at 507 (noting the finding in Fullilove that "Congress . . . carefully examined and rejected race-neutral alternatives before enacting the MBE set-aside"). [20] That finding is law of the case and is not clearly erroneous. See Agostini, 521 U.S. at 236; McIlravy, 204 F.3d at 1034-35. The long history of discrimination in, and affecting, the public construction procurement market—despite the efforts dating back at least to the enactment in 1958 of the SBA to employ race-neutral

_____

[20] Although the standard of review and result of Fullilove have been called into question by Adarand III, the district court noted, in our view correctly, that a square majority of the Court in Croson cited with approval the principal opinion in Fullilove for this factual finding. We fail to see how this factual aspect of Fullilove has been impaired; Adarand offers no authority to refute the finding that three decades of race-neutral measures failed to have any appreciable effect on the exclusion of minorities from the receipt of government highway largesse. Adarand offers no evidence to rebut the district court's conclusion that Congress entertained and indeed attempted years of race-neutral measures without success before resorting to the programs at issue in this lawsuit.

measures—places a formidable burden on both existing and would-be minority participants and thus justifies race-conscious action to address a decidedly racial disparity.

A separate question, however, is whether the FLHP considered other more narrowly tailored measures before deciding to implement 15 U.S.C. § 644(g) by means of the SCC, with its race-based presumptions of disadvantage. The government's argument focuses on Congress's consideration of race-neutral measures prior to enacting its policy of maximizing opportunity for minority-owned and controlled businesses and setting aspirational goals for the participation of such businesses in federal contracting. Although Congress considered the futility of race-neutral measures prior to incorporating the aspirational goals into the SBA and the relevant appropriations measures, the government fails to address whether the FLHP considered either measures short of a race-conscious subsidy to prime contractors or a more refined means of assessing subcontractors' eligibility for race-conscious programs prior to promulgating the regulations implementing the SCC. The record persuades us that under the high degree of solicitude for individual rather than race-based consideration mandated by the Court's strict scrutiny standard, the government has not shown that the FLHP adequately considered such alternative measures in the 1996 SCC program.

Again, the situation has since changed dramatically. [21] A comparison of that previous SCC program with the new federal regulations under TEA-21 is particularly instructive. The current, revised regulations instruct recipients that "[y]ou must meet the maximum feasible portion of your overall goal by using race-neutral means of facilitating DBE participation," 49 C.F.R. § 26.51(a) (2000); see also 49 C.F.R. § 26.51(f) (2000) (if a recipient can meet its overall goal through race-neutral means, it must implement its program without the use of race-conscious contracting measures), and enumerate a list of race-neutral measures, see 49 C.F.R. § 26.51(b) (2000). The current regulations also outline several race-neutral means available to program recipients including helping overcome bonding and financing obstacles, providing technical assistance, establishing programs to assist start-up firms, and other methods. See 49 C.F.R. § 26.51(b). We therefore are dealing here with revisions that emphasize the continuing need to employ non-race-conscious methods even as the need for race-conscious remedies is recognized. The record before us does not indicate whether or not FLHP considered race-neutral measures prior to resorting to the SCC. This absence weighs strongly against any finding of narrow tailoring. See

---

[21] The regulatory changes discussed below resulted from several years of study and consideration of Croson and Adarand III. See 64 Fed. Reg. 5096, 5101-03 (1999) (discussing how regulatory changes address the requirements of narrow tailoring).

Adarand III , 515 U.S. at 237-38;  Croson , 488 U.S. at 507.  The district court was therefore correct, given the information before it at the time, that the SCC program was not narrowly tailored, and should the government reinstitute the revised program without considering race-neutral measures similar to those outlined in 49 C.F.R. § 25.51(a) and (b) (2000), that program too would be insufficiently narrowly tailored.

### 3.  Appropriate Limit on Duration

A second important factor in any narrow-tailoring analysis is a limit on the duration of the race-conscious measures at issue.  The district court declined to address this aspect of the Supreme Court's inquiry on remand because of the court's finding that the 1996 SCC program was not narrowly tailored for other reasons.  See Adarand IV , 965 F. Supp. at 1584.  Although we agree for different reasons that the 1996 program the district court considered was insufficiently narrowly tailored to pass constitutional muster, the factor of limited duration is mentioned in  Adarand III , 515 U.S. at 238, and we accept the Court's invitation to consider this factor now.

The duration of a particular company's DBE status is limited by statute and regulation to approximately ten-and-one-half years under the § 8(a) certification program.  See 15 U.S.C. §§ 634(b)(6), 636(j)(10)(C)(i), 637(a), (d); 13 C.F.R. § 124.110 (1996); 13 C.F.R. § 124.2 (2000).  Moreover, each participant in the

§ 8(a) program is required to annually submit financial and other information, on the basis of which the SBA reevaluates and may "graduate" a small disadvantaged business from the program as no longer qualified (e.g., because the criteria of economic disadvantage are no longer met).   See 15 U.S.C. §§ 636(j)(10)(G), 637(a)(6)(B), (C).  The § 8(a) program's inherent time limit and graduation provisions ensure that it, like the program upheld in   Paradise , is carefully designed to "endure[] only until . . . the discriminatory impact" has been eliminated; once a DBE loses its economic disadvantage, it loses its certification.   Paradise , 480 U.S. at 178.  As far as we can ascertain from the regulations previously in effect, the § 8(d) program did not have an analogous individual time limit  .  Therefore, insofar as the 1996 SCC program relied on § 8(a) criteria, those criteria increased the narrow tailoring of the program.  However, insofar as the program relied on § 8(d) criteria, through state certifications, [22] we discern no evidence that the specific criteria of DBE eligibility provide a temporal limit to the program.  Thus, insofar as the district court suggested that an SCC program based on § 8(a) criteria would be insufficiently narrowly tailored, we disagree; the court's skepticism about the

---

[22]  Notably, Gonzalez was certified through such a state program in the present case, belying the government's argument that there was no evidence of unconstitutional state certifications under the version of § 8(d) in place at the time this litigation commenced  .

fatality in fact of strict scrutiny in the narrow-tailoring context is contrary to the Supreme Court's own pronouncements in both Adarand III , 515 U.S. at 237, and Croson , 488 U.S. at 509.

In this respect, too, we note that the government has modified its unconstitutional practices. The current § 8(d) program regulations specifically incorporate the certification requirements from the Small Business Administration regulations implementing the § 8(a) program. See 48 C.F.R. § 19.001 (2000) (incorporating certification requirements of 13 C.F.R. pt. 124, subpt. B) ; 13 C.F.R. § 124.1002(a) (2000) (incorporating § 8(a) criteria from 13 C.F.R. pt. 124, subpt. A) . The regulations incorporated into the § 8(d) program provide for a certification of a business as socially and economically disadvantaged for three years after either the initial certification or other administrative determination. See 13 C.F.R. § 124.1014 (2000). If a business wishes to remain certified for longer than three years, it must "submit a new application and receive a new certification." Id. § 124.1014(c). [23] Therefore,

---

[23] Although the § 8(a) program provides for annual rather than tri-annual review of DBE certification, for purposes of the "duration" prong of the narrow-tailoring inquiry, that difference is not so glaring as to require striking down the § 8(d) program; rather, it is the periodic reevaluation of disadvantaged status that renders this aspect of the program narrowly tailored because in that way, the program will not last longer than the situation it seeks to correct.

with regard to appropriate limitations on duration, the current DBE certification programs are narrowly tailored.

Finally, we note that Congress extensively debated whether to renew the DBE program prior to passing TEA-21 in 1998. See, e.g. , 144 Cong. Rec. S1481-06, S1481-96 (March 6, 1998); id. S1395-01, S1395-434 (March 5, 1998); id. H1885-04, H2000-11 (Apr. 1, 1998). These debates, in addition to the limited duration of the DBE program in accordance with the limited duration of TEA-21 and other highway appropriations statutes like it, indicate that the race-conscious programs at issue are "appropriately limited" to last no longer than "the discriminatory effects [they are] designed to eliminate." Adarand III , 515 U.S. at 238 (quotation omitted).

4.  Additional Narrow-Tailoring    Factors

Although they were not emphasized by the     Adarand III  Court, we deem the other factors discussed in    Paradise , 480 U.S. at 171, and   Croson , 488 U.S. at 507-08, to be of value in the narrow tailoring analysis, and we turn to them now.

a.  Flexibility

The 1996 SCC program, providing a subsidy for the use of DBEs, is certainly more flexible than the set-asides considered in either      Fullilove  or Croson  because the program is not mandatory.  It does not require the use of DBEs in subcontracting against the will of the prime contractor.      See Adarand

IV, 965 F. Supp. at 1583 (finding that the prime contractor's choice to avail itself of the SCC is "more flexible than the 'rigid racial quota' struck down in Croson, 488 U.S. at 499, and the 10 percent set aside upheld in Fullilove, 448 U.S. at 513-14"). [24] Moreover, the 1996 SCC program incorporates an additional element of flexibility—"the availability of waiver," Paradise, 480 U.S. at 171—because any prime contractor is free not to take advantage of the clause and will never be required to make a "gratuitous" choice of subcontractors, id. at 178. With regard to flexibility, the 1996 program passes muster under a narrow-tailoring analysis.

Nothing has changed in this regard from 1996 until the present that would militate the contrary conclusion. On the contrary, the present version of the regulations have increased the flexibility of the government's DBE programs: An express waiver provision has been added to the current regulations. See 49

---

[24] None of the parties in this case contend that SBA § 8(d)(4), 15 U.S.C. § 637(d)(4), pertains to the SCC. However, even if § 8(d)(4) were relevant here, that would not change our conclusion that the SCC is not mandatory in nature. Section 8(d)(4)(E) informs government agencies letting contracts that they are "authorized to provide such incentives as such Federal agency may deem appropriate in order to encourage such subcontracting opportunities as may be commensurate with the efficient and economical performance of the contract." 15 U.S.C. § 637(d)(4)(E) (emphasis added). This language demonstrates that § 8(d)(4) merely authorizes, but does not require, the use of incentives (of whatever type) to further the aspirational goals of increased participation in government contracts by socially and economically disadvantaged individuals. The fact that the FLHP has discontinued use of the SCC further demonstrates that § 8(d)(4) in no way requires an incentive clause in federal highway transportation contracts.

C.F.R. § 26.15 (2000) (allowing recipients of federal highway construction funds to seek waivers and exemptions, despite the already non-mandatory nature of DBE programs).

    b.  Numerical Proportionality

    The essential question arising out of the numerical proportionality factor of Paradise is whether the aspirational goals of 5% in the SBA and 10% participation contained in STURAA, ISTEA, and TEA-21 are proportionate only if they correspond to an actual finding as to the number of existing minority-owned businesses.  D espite involving a rigid quota rather than flexible and periodically adjusted aspirational goals,     Croson may be read to suggest as much. See Croson , 488 U.S. at 507 (characterizing as "completely unrealistic" the "assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population" (citing     Sheet Metal Workers   , 478 U.S. 421 at 494 (O'Connor, J., concurring in part and dissenting in part))). However, because Congress has evidence that the effects of past discrimination have excluded minorities from the construction industry and that the number of available minority subcontractors reflects that discrimination, the     existing percentage of minority-owned businesses is not necessarily an absolute cap on the percentage that a remedial program might legitimately seek to achieve. Absolute proportionality to overall demographics is an unreasonable goal.

However, Croson does not prohibit setting an aspirational goal above the current percentage of minority-owned businesses that is substantially below the percentage of minority persons in the population as a whole. This aspirational goal is reasonably construed as narrowly tailored to remedy past discrimination that has resulted in homogenous ownership within the industry. It is reasonable to conclude that allocating more than 95% of all federal contracts to enterprises owned by non-minority persons, or more than 90% of federal transportation contracts to enterprises owned by non-minority males, is in and of itself a form of passive participation in discrimination that Congress is entitled to seek to avoid. See Croson, 488 U.S. at 492 (Op. of O'Connor, J.).

Apart from the reasonableness of the goals, the record before us supports the government's contention that the 5% and 10% goals incorporated in the statutes at issue here, unlike the set-asides in both Fullilove and Croson, are merely aspirational and not mandatory. Cf. Croson, 488 U.S. at 508 (finding no need "for a rigid numerical quota"). Therefore, while the goal may well be relevant to the numerical proportionality aspect of the Paradise strict scrutiny inquiry, we disagree with the district court that the goal itself is facially unconstitutional. Moreover, there is simply no showing that Adarand lost or will lose contracts due to the STURAA/ISTEA/TEA-21 10% goals for DBE participation, but rather only due to the over- or under-inclusive race-based

-68-

presumptions involved in certification for 1996 SCC eligibility. Therefore, we conclude both that Adarand is without standing to mount any independent challenge to the 5% and 10% figures and that such a challenge is outside the scope of the Supreme Court's Adarand III remand. See Adarand IV, 965 F. Supp. at 1566 n.11 (noting that "Defendants maintain, and Adarand does not dispute, that the challenge in this action is based only on the use of the SCC to meet the various goals" established by the SBA, STURAA, and ISTEA).

We also conclude the government failed to carry its evidentiary burden in the district court insofar as the use of the 1996 SCC was based on an ill-defined 12-15% goal apparently adopted by the Federal Highway Administration ("FHA"). ( See Appellants' App. at 187.) Unlike the congressionally-mandated goals that are supported by legislative history and supplemental evidence, we can find no explanation in the record before us of the basis in evidence on which the FHA relied in adopting this 12-15% goal (if in fact there is one). That congressional findings support the 5% and 10% aspirational goals in the SBA and transportation appropriation statutes, respectively, as well as the delegation of responsibility for setting individual goals to various agencies, does not vitiate the constitutional duty of those agencies to assure that the goals are supported by evidence that meets the requirements of Croson and Concrete Works . The complete absence of an explanation for the 12-15% goal in the record would have

required granting summary judgment in favor of Adarand on the question of whether use of the 1996 SCC is narrowly tailored to meet the compelling interest determined by Congress.

Once again, however, comparison of the 1996 SCC to the current TEA-21 regulations is instructive and leads us to the conclusion that the recent regulatory changes preclude ruling in favor of Adarand at the present time for reasons beyond the abandonment of use of the SCC in federal highway construction contracting. The process by which recipients of federal transportation funding set aspirational goals is now much more rigorous. The current regulation instructs each recipient that its "overall goal must be based on demonstrable evidence of the availability of ready, willing and able DBEs relative to all businesses ready, willing and able to participate on [the recipient's] DOT-assisted contracts" and must make "reference to the relative availability of DBEs in [the recipient's] market." 49 C.F.R. § 26.45(b) (2000). In addition, goal setting must involve "examining all evidence available in [the recipient's] jurisdiction." Id. § 26.45(c). Such evidence may include census data and valid disparity studies. See id. § 26.45(c)(1)-(3). After examining this evidence, the recipient must adjust its DBE participation goal by examining the capacity of DBEs to perform needed work, disparity studies, and other evidence. See id. § 26.45(d). When submitting a goal, the recipient must include a description of the methodology and evidence

-70-

used.  See id. § 26.45(f)(3).  Significantly, the rigidity of even those realistic goals is negligible.  Once the goals have been set, there is no requirement that the recipient actually meet them, merely that it make a good faith effort to do so:  So long as good faith efforts were made, failure to meet a goal will not subject a recipient to penalties or to being held in noncompliance.      See id. § 26.47(a).  These new requirements that federal agencies rigorously examine, in a verifiable manner, the reasonableness of DBE programs given particular local conditions further ensure that government agencies will heed      Croson's mandate to avoid rigid application of DBE percentages in government contracting.      See 488 U.S. at 507.

In sum, in conformity with the aspirational nature of the percentage goals of the relevant statutes, the current regulations emphasize that the 10% figure is nothing more than "an aspirational goal at the national level," 49 C.F.R. § 26.41(b) (2000), which "does not authorize or require recipients to set overall or contract goals at the 10 percent level, or any other particular level,"      id. § 26.41(c).  Thus, in practice there are significant requirements currently in place that must be met by any recipient of federal highway construction funds before setting even an aspirational goal for DBE participation.  There is little danger of arbitrariness in the setting of such goals, as was the case in      Croson , 488 U.S. at 507.

c. Burden on Third Parties

As for the third Paradise factor, the burden on third parties is obviously significant enough to grant standing to Adarand. See Adarand III , 515 U.S. at 211-12. While there appears to be no serious burden on prime contractors, who are obviously compensated for any additional burden occasioned by the employment of DBE subcontractors, at the margin, some non-DBE subcontractors such as Adarand will be deprived of business opportunities. See Wygant , 476 U.S. at 280-81 (Op. of Powell, J.) ("When effectuating a limited and properly tailored remedy to cure the effects of prior discrimination, . . . a 'sharing of the burden' by innocent parties is not impermissible." (quoting Fullilove , 448 U.S. at 484 (plurality)) (further quotations and footnote omitted)). Insofar as the 1996 and current SCC programs are "limited in scope and duration, [they] only postpone[]" the hiring of non-DBEs, "impos[ing] a diffuse burden . . . foreclosing only one of several opportunities." Paradise , 480 U.S. at 183 (quoting Wygant , 476 U.S. at 283).

These further limitations have been incorporated: (1) Compensation under the SCC above 1.5-2% of the total contract is prohibited ( see Appellants' App. at 56); (2) under the revised SCC, there is also a monetary limit to compensation under the program of $50,000-$100,000 ( see Appellants' Supp. Br. Attach. 2 at 3). Thus, the subsidy is capped in such a way as to circumscribe the financial

incentive to hire DBEs; after a fairly low threshold, the incentive for the prime contractor to hire further DBEs disappears.

Moreover, the current regulations are designed to increase the participation of non-minority DBEs.   As to those not falling into one of the categories to which a presumption of social disadvantage applies, the current regulations retain procedures for non-minorities to participate in the DBE program.  Consistent with the changes in SBA regulations, proof of social disadvantage by those not so presumed may be shown by a preponderance of the evidence, rather than by the former "clear and convincing" standard.    Compare 49 C.F.R. §§ 26.61(d), 26.67(d) (2000) and 13 C.F.R. § 124.105(c)(1) (2000)     with 13 C.F.R. § 124.105(c)(1) (1996).  The current regulations also require recipients to ensure that DBEs are not "so overconcentrated in a certain type of work as to unduly burden the opportunity of non-DBE firms to participate." 49 C.F.R. § 26.33(a) (2000).

While at the margin, some DBEs may be hired under the program in lieu of non-DBEs, the possibility that innocent parties will share the burden of a remedial program is itself insufficient to warrant the conclusion that the program is not narrowly tailored.  To invalidate the 1996 and revised SCC and other government DBE programs on that basis would be to render strict scrutiny

effectively fatal, in contravention of Justice O'Connor's clear statements to the contrary.  See Adarand III , 515 U.S. at 237.

   d.  Over- or Under-Inclusiveness

The last  factor we must consider in applying strict scrutiny in this case is that of the over- or under-inclusiveness of the programs at issue.  One factor in the Croson Court's rejection of the Richmond Plan was the lack of "inquiry into whether or not the particular MBE seeking a racial preference has suffered from the effects of past discrimination."     Croson , 488 U.S. at 508.

Even if a race-conscious    means  of achieving the goal of increasing minority participation is necessary, in promulgating the SCC in use at the time of the district court's decision in     Adarand IV , defendants-appellants have not demonstrated that they considered the effectiveness of at least one other, less sweeping approach to implementing a race-conscious SCC program: disaggregating the presumptions of social and economic disadvantage, as is the case under the SBA § 8(a) program, to require a separate determination of social disadvantage and economic disadvantage.     See 48 C.F.R. § 52.219-8 (1996). Requiring a separate showing as to each type of disadvantage would help address the Court's concern in    Croson  that a government entity undertake the necessary administrative effort "to tailor remedial relief to those who truly have suffered from the effects of prior discrimination."      488 U.S. at 508.  The record does not

-74-

disclose any evidence that defendants undertook, and found to be unsuccessful, a program incorporating, as under § 8(a), a more individualized inquiry as to economic disadvantage prior to implementing the particular SCC program at issue in this litigation.

If the § 8(d) program in place prior to 1999 is interpreted, as we conclude it must be, to accord a presumption of economic as well as social disadvantage to minority individuals under § 8(d), while not doing so under § 8(a), that fact suggests that another more carefully tailored approach is available, i.e., the § 8(a) approach of individualized inquiry into economic disadvantage.  The final section of Adarand III , 515 U.S. at 238-39, suggests the distinction is relevant.  If individualized inquiry into economic disadvantage is sufficient to serve the purpose, why then dispense with such inquiry under § 8(d)?  Indeed, if one can qualify under § 8(d), what is the significance of permitting qualification under § 8(a), aside from the practical matter of already including those DBEs enjoying § 8(a) benefits?

At the time  Adarand IV  originally was appealed in 1997, the government argued that the more lenient approach of § 8(d) is acceptable because of the differing purposes of § 8(a) and § 8(d).

> The [§] 8(a) program is targeted towards a smaller number of firms and provides direct assistance and protection from open competition over a period of years to help such firms become viable as prime contractors.  By contrast, the [§] 8(d) program is focused on opening

up federal subcontracting opportunities to a much larger number of small disadvantaged firms, and thus imposes less restrictive qualifications.

(Appellants' Br. at 34 (citing 13 C.F.R. § 124.06(b) (1997)).)  That distinction, however, fails to identify why an individualized inquiry into economic disadvantage, which is admittedly practicable for § 8(a) purposes, was unnecessary for the particular purposes of § 8(d) prior to 1999.  To put it simply, presuming economic disadvantage based on membership in certain racial groups does make § 8(d) "less restrictive," but it is not thereby narrowly tailored.  The government fails to explain why it could not have used a non-race-based means of making § 8(d) "less restrictive."  Therefore, we must conclude, under Croson, that the § 8(d) method of certification reviewed by the district court in Adarand IV is not narrowly tailored insofar as it obviates an individualized inquiry into economic disadvantage.  See Croson, 488 U.S. at 508 (rejecting an affirmative action program in part because "there is no inquiry into whether or not the particular MBE seeking a racial preference has suffered from the effects of past discrimination . . .[, and] the interest in avoiding the bureaucratic effort necessary to tailor remedial relief to those who truly have suffered from the effects of prior discrimination cannot justify a rigid line drawn on the basis of a suspect classification" (citation omitted)).

-76-

Requiring state certification standards to incorporate an individualized inquiry into economic disadvantage would certainly increase the burden on enterprises seeking DBE certification, as the government argues, and therefore would presumably reduce the pool of eligible enterprises. That increased burden, however, is slight when compared with the constitutional imperative to avoid over- or under-inclusive racial classifications—the "Sultan of Brunei" scenario that troubled the district court, Adarand IV, 965 F. Supp. at 1581 n.17—, and the § 8(d) certification process thus fails to satisfy the narrow tailoring prong of the strict scrutiny inquiry. Cf. Croson, 488 U.S. at 508. When faced with the readily available alternative approach under § 8(a) of requiring would-be DBEs to provide a narrative statement of the economic disadvantage they have faced, combined with the various other more narrowly tailored alternatives discussed above, we fail to see how the SCC approach to certification in use at the time of Adarand IV satisfies the rigorous narrow tailoring requirement of the strict scrutiny calculus. In short, by inquiring into economic disadvantage on an individual basis, the program could avoid improperly increasing the contracting opportunities of those minority entrepreneurs whose access to credit, suppliers, and industry networks is already sufficient to obviate the effects of discrimination, past and present.

Yet again, the government has eliminated its offending 1996 practices. In particular, it has eliminated the discrepancy between the individualized determination of economic disadvantage characterizing the § 8(a) program and the non-individualized presumption of economic disadvantage characterizing the § 8(d) program. See 48 C.F.R. § 19.001 (2000) (providing that the § 8(d) program regulations expressly incorporate the definitions of "small disadvantaged business concern" contained in 13 C.F.R. pt 124, subpt. B); 13 C.F.R. § 124.1002(a) (2000) (incorporating § 8(a) criteria from 13 C.F.R. pt. 124, subpt. A); see also 48 C.F.R. § 19.703 (2000) (eliminating the race-based presumption of economic disadvantage of the former regulation); id. § 52.219-8. The current regulations also impose a new requirement on applicants with regard to an individualized showing: They must submit a narrative statement describing the circumstances of that purported economic disadvantage. See 13 C.F.R. § 124.104(b)(1) (2000); see also 49 C.F.R. § 26.67(b)(1) (2000) (providing a net worth limit for DBEs under ISTEA and TEA-21); id. § 26.65(b) (stating that businesses exceeding a certain amount of gross receipts are ineligible for the DBE program). With the individualized determination of § 8(a) extended to economic disadvantage under § 8(d), the main obstacle to a finding of narrow tailoring has disappeared.

Thus, one of Adarand III 's "unresolved questions" has been answered, namely, whether the § 8(d) DBE certification program requires an individualized showing of economic disadvantage or whether the presumption applies to both social and economic disadvantage. Adarand III , 515 U.S. at 238. The 1996 § 8(d) certification program did not require an individualized showing of economic disadvantage, whereas the current § 8(d) certification program does require such an individualized showing.

There remains a further question of over- and under-inclusiveness that we must consider. The district court, Adarand IV , 965 F. Supp. at 1580, found that the 1996 SCC program was not narrowly tailored in part due to a failure to inquire into discrimination against each particular minority racial or ethnic group. The district court's opinion cites Adarand's arguments that "there is no evidence that Aleuts, Samoans or Bhutans [sic] have been discriminated against in the Colorado construction industry." Id. Insofar as the district court held that the scope of the inquiry into the statutes generally was the Colorado construction industry alone, this is at odds with our holdings regarding compelling interest and Congress's power to enact nationwide legislation. Furthermore, as discussed below, because of the unreliability of racial and ethnic categories and the fact that discrimination commonly occurs based on much broader racial classifications, extrapolating findings of discrimination against Native

-79-

Americans, Asian-Pacific Americans, and Asian-Americans to include Aleuts, Samoans, and Bhutanese, respectively, is more a question of nomenclature than of narrow tailoring. The Constitution does not erect a barrier to the government's effort to combat discrimination based on broad racial classifications that might prevent it from enumerating particular ethnic origins falling within such classifications. While the concept of classifying human beings by race is distasteful, the fact remains that discrimination occurs based on such classifications, and engaging the classifications in order to eradicate such discrimination is a necessary evil which constitutes a compelling government interest.

We agree in principle that the 1996 SCC program would be more narrowly tailored had the CFLHD conducted an inquiry into the scope of discrimination within the region it administers as the current regulations mandate. [25] However,

---

[25] Nonetheless, the geographic scope of the remedial powers of a local government, as in Croson, and that of Congress's remedial powers under § 5 of the Fourteenth Amendment differ. See Croson, 488 U.S. at 488 (Op. of O'Connor, J.). In Croson, the City ignored the fact

> that Congress, unlike any State or political subdivision, has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment. The power to "enforce" may at times also include the power to define situations which Congress determines threaten principles of equality and to adopt prophylactic rules to deal with those situations.

(continued...)

the district court's ensuing conclusion appears to stem from a premise that a classification, to be narrowly tailored, must not only include minority individuals who have themselves suffered discrimination, but must also automatically include all non-minority individuals who have suffered disadvantage as well. Cf. Fullilove , 448 U.S. at 486 ("There has been no showing in this case that Congress has inadvertently effected an invidious discrimination by excluding from coverage an identifiable minority group that has been the victim of a degree of disadvantage and discrimination equal to or greater than that suffered by the groups encompassed by the MBE program."). Requiring that degree of precise fit would again render strict scrutiny "fatal in fact." Id. at 507 (Powell, J., concurring). We hold that such fatality is inconsistent with Adarand III , which re-affirmed Paradise , in its declaration that strict scrutiny was not fatal in fact. See Adarand III , 515 U.S. at 237. There can be a permissible middle ground in appropriate circumstances between the entirely individualized inquiry of a Title VII lawsuit, for example, and an unconstitutionally sweeping, race-based generalization. Indeed, the police officers receiving the benefit of the promotion

_____

[25](...continued)
Id. at 490 (Op. of O'Connor, J.) (citations omitted).

policy in Paradise were not required to prove that they themselves individually were victims of past discrimination. [26]

Although we disagree with the district court's effectively fatal standard of scrutiny, we again note that comparison with the current SBA § 8(d) and TEA-21 regulations illustrates how the more careful tailoring now in place avoids some of the problems identified by the district court—again, the court's conclusion that the "Sultan of Brunei," should he have the temerity to apply, could qualify for DBE status. Adarand IV , 965 F. Supp. at 1581 n.17. See 13 C.F.R. § 124.104(c)(2) (2000); 48 C.F.R. §19.001 (2000); 49 C.F.R. §§ 26.65, 26.67(b) (2000) (providing for an individual net worth limit for DBE certification). The current regulations more precisely identify the proper minority recipients of DBE certification by periodically re-screening for economic disadvantage all candidates for such certification. See 48 C.F.R. § 19.1014 (2000).

---

[26] Although the viability of Fullilove is uncertain, the Fullilove majority rejected a very similar overinclusiveness challenge to the 1977 10% MBE set-aside:

> It is also contended that the MBE program is overinclusive—that it bestows a benefit on businesses identified by racial or ethnic criteria which cannot be justified on the basis of competitive criteria or as a remedy for the present effects of identified prior discrimination. It is conceivable that a particular application of the program may have this effect; however, the peculiarities of specific applications are not before us in this case.

Fullilove , 448 U.S. at 486.

Mindful of the Supreme Court's mandate to exercise particular care in examining governmental racial classifications, we conclude that the 1996 SCC was insufficiently narrowly tailored as applied in this case and is thus unconstitutional under Adarand III 's strict standard of scrutiny. Nonetheless, after examining the current SCC and DBE certification programs, we conclude that the 1996 defects have been remedied, and the relevant programs now meet the requirements of narrow tailoring.

## D. "Unresolved Question"

As a final matter, inasmuch as Adarand III suggests that an additional "unresolved question[]" concerning one of "the details of the complex regulatory regimes," 515 U.S. at 238, bears on the constitutionality of the SCC program, we address that question now: namely, whether there are differing definitions of economic disadvantage under § 8(a) and § 8(d). The 1996 regulations establish that § 8(a) certification requires, for determination of economic disadvantage, comparison with "others in the same or similar line of business who are not socially disadvantaged." 13 C.F.R. § 124.106(a) (1996). Subsection 8(d) certification, however, apparently requires comparison with "others in the same or similar line of business" generally, presumably with all others, socially disadvantaged or not. 13 C.F.R. § 124.106(b) (1996). Because under 1996 programs based on § 8(d) economic disadvantage is to be presumed for

minorities, the § 8(d) comparative analysis would appear to arise only in the event of either a challenge to the presumption in the case of a particular minority DBE, or application for DBE status by a socially-disadvantaged non-minority subcontractor (the classic example being the white subcontractor from rural Appalachia). We are unable to discern the constitutional relevance of these two slightly different methods of comparison. [27] Moreover, the distinction between the two has disappeared in the current version of the regulations. The current regulation retains the more precise definition previously applicable to the § 8(a) program, requiring a comparison of the applicant to those who are not socially disadvantaged. See 13 C.F.R. § 124.104(a) (2000); see also 48 C.F.R. § 19.001 (2000) (incorporating the definitions of "small disadvantaged business concern" contained in 13 C.F.R. pt. 124, subpt. B); 13 C.F.R. § 124.1002(a) (2000) (incorporating 13 C.F.R. pt. 124, subpt. A, in determining social and economic disadvantage).

## IV

As a final matter, the government argues that we should remand this case in light of a pending, potentially related lawsuit originally filed under the name

[27] We reject the contention that two slightly different definitions of economic disadvantage for purposes of two different certification methods create uncertainty as to who is a DBE, thus necessarily precluding any finding of narrow tailoring.

Adarand Constructors, Inc. v. Romer, No. CIV. A. 97-K-1351 (D. Colo.) (filed June 26, 1997). [28] Romer involves a challenge by plaintiff in the instant case to use of race-conscious policies in highway construction projects by CDOT. Adarand has conceded that its challenge in the instant case is to "the federal program, implemented by federal officials," and not to the letting of federally-funded construction contracts by state agencies. (Appellee's Br. at 24 n.23.) We do not have before us a sufficient record to enable us to evaluate the separate question of CDOT's implementation of race-conscious policies. The propriety of potential consolidation of the instant action and Romer following our remand is a question to be considered by the district court in the first instance, should that question arise.

## V

The judgment of the district court is **REVERSED**. This matter is remanded for further proceedings consistent with this opinion.

---

[28] Decisions arising out of the Romer litigation include: Adarand Constructors, Inc. v. Romer, 174 F.R.D. 100 (D. Colo. 1997) (denying the federal government's motion to intervene); Adarand Constructors, Inc. v. Romer, No. 97-1285, 1999 WL 770176 (10th Cir. Sept. 29, 1999) (unpublished) (permitting intervention by the federal government); and Adarand Constructors, Inc. v. Owens, No. CIV. A. 97-K-1351, 2000 WL 490690 (D. Colo. Apr. 24, 2000) (unpublished) (dismissing the governor of Colorado as a defendant).

# APPENDIX

As noted, several statutes are implicated in this case, notably the Small Business Act of 1958 ("SBA"), Pub. L. No. 85-536, 72 Stat. 384, as amended, 15 U.S.C. §§ 631 et seq. , § 106(c) of the Surface Transportation and Uniform Relocation Assistance Act of 1987 ("STURAA"), Pub. L. No. 100-17, 101 Stat. 132, and § 1003(b) of the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"), Pub. L. No. 102-240, 105 Stat. 1914, the Transportation Equity Act for the 21st Century of 1998 ("TEA 21"), Pub. L. No. 105-178, 112 Stat. 107, 113, as well as their accompanying administrative regulations. In the discussion that follows, we outline the statutory and regulatory scheme as it was at the time of the first and second district court decisions. [29] Then we discuss the relevant changes in that scheme after 1997.

## A. SBA

Subsection 8(d)(1) of the SBA states "[i]t is the policy of the United States that small business concerns, and small business concerns owned and controlled by socially and economically disadvantaged individuals, . . . shall have the maximum practicable opportunity to participate in the performance of contracts

---

[29] The relevant language in the statutes and regulations did not change in any material way between Adarand I and Adarand IV , and therefore references to regulations are to 1991 regulations unless otherwise indicated.

let by any Federal agency." 15 U.S.C. § 637(d)(1). [30] "Socially disadvantaged individuals" are defined as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5). The SBA further defines "economically disadvantaged individuals" as "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." 15 U.S.C. § 637(a)(6)(A). [31]

15 U.S.C. § 637(d)(2) requires that all federal contracts, with certain exceptions not relevant here, contain a clause stating it is the government's policy for small disadvantaged businesses to have "the maximum practicable opportunity to participate" as contractors or subcontractors. See 15 U.S.C. § 637(d)(3). The required clause includes the following language: "The contractor shall presume that socially and economically disadvantaged

---

[30] The SCC defines Disadvantaged Business Enterprises ("DBEs") as those concerns owned and operated by socially and economically disadvantaged individuals.

[31] It appears that the 1996 regulations implementing the § 8(d) certification program provide that the showing of disadvantage requires a general comparison "to others in the same or similar line of business." 13 C.F.R. § 124.106(b)(1) (1996). Justice O'Connor suggests that this distinction may have constitutional significance. See Adarand III , 515 U.S. at 238.

-87-

individuals include Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities, or any other individual found to be disadvantaged by the Administration pursuant to section 8(a) of the Small Business Act [15 U.S.C. 637(a)]." 15 U.S.C. § 637(d)(3)(C). [32]

15 U.S.C. § 644(g)(1) provides for a government-wide goal of 5% minimum minority business participation calculated on the basis of "the total value of all prime contract and subcontract awards for each fiscal year." [33] The

---

[32] 15 U.S.C. § 637(d)(4) provides for certain additional requirements for contracts to be awarded "pursuant to the negotiated method of procurement" and exceeding certain dollar amounts. These requirements include an approved plan providing maximum opportunity for small business concerns, see id. § 637(d)(4)(D), and provision for agencies to offer incentives to encourage subcontracting opportunities for small business concerns owned and controlled by socially and economically disadvantaged individuals, see id. § 637(d)(4)(E). The parties have not addressed paragraph (4) of § 8(d) at all, and, because there is no indication from the parties that Adarand has or will bid for contracts governed by that paragraph's requirement, we do not address it in great detail.

[33] Section 644(g)(1) provides in relevant part that

[t]he President shall annually establish Government-wide goals for procurement contracts awarded to small business concerns and small business concerns owned and controlled by socially and economically disadvantaged individuals . . . . The Government-wide goal for participation by small business concerns owned and controlled by socially and economically disadvantaged individuals shall be established at not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year. . . . Notwithstanding the Government-wide goal, each agency shall have an annual goal that presents, for that agency, the maximum practicable opportunity . . . for small business concerns owned and controlled by socially and economically disadvantaged individuals to

(continued...)

-88-

Federal Highway Administration appears to have adopted, pursuant to 15 U.S.C. § 644(g)(2), goals of 12-15% participation for the period of time pertinent to this litigation. (Appellants' App. at 187.) These goals are aspirational rather than mandatory and must "realistically reflect the potential" of small disadvantaged businesses to perform subcontracts. See 15 U.S.C. § 644(g)(2), (h)(1). Section 644(h) further mandates annual reports to the Administration and Congress on the results of government agency efforts to increase contracting participation by small businesses, including those owned and controlled by socially and economically disadvantaged individuals.

1. Subsection 8(a)

The § 8(a) program provides numerous benefits to disadvantaged businesses aside from eligibility for the SCC program.[34] Eligibility requires "small" size and 51% ownership by individuals socially and economically disadvantaged. See 13 C.F.R. § 124.103. Subsection 8(a) regulations incorporate a presumption that enumerated minorities are socially disadvantaged, see 13 C.F.R. § 124.105(b)(1), and others can prove social disadvantage by clear

---

[33](...continued)
participate in the performance of contracts let by such agency.

[34] Although Adarand lacks standing to challenge the constitutionality of the § 8(a) program per se, we consider its provisions insofar as they are relevant to the use of racially-conscious presumptions in determining certification of DBEs for the SCC program challenged here.

and convincing evidence, see id. § 124.105(c). The presumption of disadvantage is in theory rebuttable by a third party. See 49 C.F.R. § 23.69. All businesses must separately prove economic disadvantage. See id. § 124.106(a). Eligibility for the § 8(a) program confers an automatic presumption of disadvantage under § 8(d). See 15 U.S.C. § 637(d)(3)(C).

2. Subsection 8(d)

The relevant portions of § 8(d) in themselves require only the inclusion of a provision in federal contracts stating the government's policy of maximizing contracting opportunities for small businesses, including those owned and controlled by socially and economically disadvantaged individuals. See 15 U.S.C. § 637(d)(1)-(3). [35] Subsection (d) is relevant to this litigation, however, insofar as the definition set forth therein serves as a basis for certifying small businesses as disadvantaged for purposes of compensating prime contractors under the SCC. See 49 C.F.R. § 23.53. [36] Like § 8(a), § 8(d) includes language

---

[35] There is no indication from any of the parties in their briefs or elsewhere that the particular requirements of paragraphs (4)-(6) of § 8(d) are at issue in the instant lawsuit or that Adarand has and will continue to bid for contracts or subcontracts covered by those paragraphs. See 15 U.S.C. § 637(d)(4)-(6).

[36] The relevant state DBE program at the time of the contract at issue, under which Adarand's competitor was certified as a DBE, provided that "persons who are members of [specified racial/ethnic minorities] are 'rebuttably presumed' to be socially and economically disadvantaged." (Appellants' App. at 131.) Pursuant to Adarand VI, because Colorado's revised program may be

(continued...)

instructing contractors to afford a presumption of social disadvantage based on race. See id. The Court stated that certain regulations based on § 8(d) "appear[] to require an individualized, although 'less restrictive,' showing of economic disadvantage." Adarand III, 515 U.S. at 207 (quoting 13 C.F.R. § 124.106(b)). However, other regulations provide for presumptions of both social and economic disadvantage. See Adarand III, 515 U.S. at 207-08 (citing 48 C.F.R. §§ 19.011, 19.703(a)(2)). The Court was thus "left with some uncertainty as to whether participation in the [§] 8(d) subcontracting program requires an individualized showing of economic disadvantage." Adarand III, 515 U.S. at 208. [37] Both presumptions of disadvantage are theoretically rebuttable by a third party. (See Appellants' App. at 131.)

## B. STURAA and ISTEA provisions

STURAA and ISTEA are relevant insofar as they incorporate the presumption of disadvantage from SBA § 8(d). See STURAA § 106(c)(2)(B),

---

[36](...continued)
inconsistent with federal requirements, we direct our inquiry to the possibility of reinstatement of the prior state DBE certification requirements, as informed by federal law and regulation.

[37] As noted, those portions of § 8(d) at issue here perhaps may be more properly characterized as a requirement that a clause be included in contracts than as a discrete program. However, the Supreme Court has characterized the requirements as a discrete program, and we note that they are certainly relevant to the SCC program at issue because they inform the criteria for certification of DBE participants by state agencies.

ISTEA § 1003(b)(2)(B) (providing that the term "socially and economically disadvantaged individual" has the meaning of such term under SBA § 8(d) "and relevant subcontracting regulations promulgated pursuant thereto."). Both measures set forth aspirational goals of 10% DBE participation in federal subcontracting. See ISTEA § 1003(b)(1).

## C. Subcontracting Compensation Clause

The particular means of implementation of the various statutory goals and directives at issue in this litigation is the SCC. This clause provides a financial bonus of up to 10% of an approved subcontract (no more than 1.5% or 2% of the original contract, depending on how many DBEs are employed) to a prime contractor in return for employing a DBE. (    See Appellants' App. at 55-56.)    [38]

---

[38] The Supreme Court in    Adarand III   stated that "[f]ederal law requires that a subcontracting clause similar to the one used here must appear in most federal agency contracts, and it also requires the clause to state that '[t]he contractor shall presume that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities, or any other individual found to be disadvantaged by the [Small Business] Administration pursuant to section 8(a) of the Small Business Act.'"    515 U.S. at 205 (quoting 15 U.S.C. §§ 637(d)(2), (3)).  However, examination of the statute reveals that 15 U.S.C. § 637, while providing for inclusion in most federal agency contracts of a clause stating that "[i]t is the policy of the United States that . . . small business concerns owned and controlled by socially and economically disadvantaged individuals, . . . shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency," 15 U.S.C. § 637(d)(3)(A), the relevant provisions of § 8(d) do not require the particular contract provision at issue here: "[m]onetary compensation . . . for awarding subcontracts to small business

(continued...)

-92-

Subcontractors must be certified as DBEs by "the SBA, a state highway agency, or some other certifying authority acceptable to the contracting officer" pursuant to the "[§] 8(a) or [§] 8(d) program, or certification by a State under the DOT regulations."  Adarand III , 515 U.S. at 209-10.

## D.  Post-1996 Changes

### 1.  SBA

There have been no significant changes to § 637(a) or (d) relevant to the Adarand litigation after 1996.  Virtually the only changes to these statutory sections were additions of language including other groups in the SBA's affirmative action program: 1995 (women); 1998 ("HUBZone small business concerns"); and 2000 (veterans).  Likewise, the key language in § 644(g)(1)—"The Government-wide goal for participation by small business

---

[38](...continued)
concerns owned and controlled by socially and economically disadvantaged individuals," Adarand III , 515 U.S. at 209 (citation omitted).  Cf. 15 U.S.C. § 637(d)(4)(E).  Rather, that clause, the SCC, was established administratively by the Federal Lands Highway Program ("FLHP") of the Department of Transportation ("DOT") pursuant to the FLHP's obligations under 15 U.S.C. § 644(g).  ( See Appellants' App. at 33.)  In  Adarand II , 16 F.3d at 1545-56, ("Adarand II "), we concluded that the FLHP was acting within its delegated power under § 644(g) in promulgating the SCC.  The Supreme Court, in altering the equal protection standard of scrutiny applicable to federal action in  Adarand III, did not disturb this statutory conclusion.  Therefore it remains law of the case that the SCC constitutes an exercise of the FLHP's delegated authority under § 644(g), and we discern no clear error in that prior decision or manifest injustice sufficient to warrant overriding the law of the case doctrine.  See Agostini , 521 U.S. at 236;  McIlravy , 204 F.3d at 1034-35.

concerns owned and controlled by socially and economically disadvantaged individuals shall be established at not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year"—has not changed. However, § 644(g)(1) has been amended at various times during the litigation to include government-wide contracting goals for other groups, such as women, service-disabled veterans, and HUBZone small business concerns.

Of the regulations implementing § 8(a) of the SBA, 13 C.F.R. §§ 124.1 et seq.,[39] two regulations—those defining social and economic disadvantage—are relevant to this litigation and differ significantly from their 1996 counterparts. The most extensive changes were made in 1998 and are present in the current regulations.

The regulation defining social disadvantage are presently located at 13 C.F.R. § 124.103, and its language, preceding the list of presumptively socially disadvantaged groups, has changed. The current regulation states: "There is a rebuttable presumption that the following individuals are socially disadvantaged . . . ." 13 C.F.R. § 124.103(b)(1) (2000); see also id. § 124.103(b)(3) ("The presumption of social disadvantage may be overcome with credible evidence to

---

[39] The § 8(d) program regulations are located at 48 C.F.R. pt. 19, but they specifically incorporate the definitions of "small disadvantaged business concern" contained in 13 C.F.R. pt. 124, subpt. B. See 48 C.F.R. § 19.001 (2000); 13 C.F.R. § 124.1002(a) (2000) (incorporating 13 C.F.R. pt. 124, subpt. A).

the contrary."). This change reemphasizes that the presumption of social disadvantage based on group membership is not absolute.

In addition, the burden on members of unlisted groups to show they are socially disadvantaged has been reduced. Currently, social disadvantage may be established by a "preponderance of the evidence," rather than by the former "clear and convincing" evidentiary standard. Compare 13 C.F.R. § 124.103(c)(1) (2000) with 13 C.F.R. § 124.105(c)(1) (1997). The Small Business Administration explains that this change was meant to more narrowly tailor the § 8(a) program in light of Adarand III . See 8(a) Business Development/Small Disadvantaged Business Status Determinations , 63 Fed. Reg. 35,726, 35,728 (1998) ("In response to the Supreme Court's decision in Adarand [III] . . . , the Department of Justice recommended the 'preponderance of the evidence' standard for government-wide disadvantaged business programs. [The Small Business Administration] . . . continues to believe that the use of this standard strengthens the defense of the [§] 8(a) B[usiness]D[evelopment] program.").

The relevant regulations regarding economic disadvantage are presently located at 13 C.F.R. § 124.104. The Adarand III majority expressed concern about the "apparent discrepancy between the definitions of which socially disadvantaged individuals qualify as economically disadvantaged for the [§] 8(a) and [§] 8(d) programs." Adarand III , 515 U.S. at 238-39. The new regulations

rectify that discrepancy, retaining the more precise definition previously applicable to the § 8(a) program, which requires comparing the applicant to those who are not socially disadvantaged.     See 13 C.F.R. § 124.104(a) (2000).  The current regulations also impose a new requirement on applicants:  They must submit a narrative statement describing their economic disadvantage.     See id. § 124.104(b)(1) (2000).

As to duration of DBE certification, the current § 8(d) certification program regulations provide for certification of a business as socially disadvantaged for three years after either the initial certification or other administrative determination.   See 13 C.F.R. § 124.1014 (2000).  If a DBE wishes to retain its certification for longer than three years, it must "submit a new application and receive a new certification."   Id. § 124.1014(c).

2.  STURAA, ISTEA, and TEA-21

The language in STURAA, ISTEA, and TEA-21 concerning the DBE program is similar.  Notably, the requirement that "not less than 10 percent of the amounts" authorized under those Acts "shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals" remains unchanged in all three statutes.  TEA-21 § 1101(b)(1), 112 Stat. at 113; ISTEA § 1003(b)(1), 105 Stat. 1919; STURAA § 106(c)(1), 101 Stat. 132.

The only significant change in the transportation appropriations statutes is the addition in both § 1003(b) of ISTEA, 105 Stat. 1920-22, and § 1101(b)(6) of TEA-21, 112 Stat. 114-15, of a requirement that the Comptroller General conduct a study and report to Congress regarding several aspects of the DBE program.

In ISTEA § 1003(b)(5), 105 Stat. 1920-22, the Comptroller General is given twelve months to study and prepare a report discussing: graduation from the program; the extent of out-of-state contracting with disadvantaged businesses by prime contractors; whether adjustments could be made "with respect to Federal and State participation in training programs and with respect to meeting capital needs and bonding requirements" to increase the success of disadvantaged business enterprises; possible "revisions and additions to criteria used to determine the performance and financial capabilities of" DBEs; the costs and benefits of meeting the goal of 10% participation by DBEs; the effect of the program on the construction industry; the certification process; and the implementation of the program by states.

In TEA-21 § 1101(b)(6), 112 Stat. 114-15, the Comptroller General is given three years to study and prepare a report discussing: the number, participation in prime contracts and subcontracts, gross receipts, and net worth of DBEs; the overall costs of the DBE program, "including administrative costs, certification costs, additional construction costs, and litigation costs"; discrimination against

DBEs in various markets including transportation contracting, financial, insurance, credit and bonding; the costs of any court order striking down the DBE program; and the impact of the program on competition and the creation of jobs.

The regulations implementing affirmative action programs of STURAA, ISTEA, and TEA-21 have undergone the most change of any of the relevant regulations at issue over the course of the instant litigation. According to the federal Department of Transportation, the changes were made "primarily in response to the 'narrow tailoring' requirements of Adarand [III]," and the final rule "complies with the requirements that the courts have established for a narrowly tailored affirmative action program." Participation by Disadvantaged Business Enterprises in Department of Transportation Programs, 64 Fed. Reg. 5096 (1999); see also id. at 5101-03 (discussing the requirements of narrow tailoring and the ways in which the new regulations attempt to meet those requirements). The current regulations, which apply to any federal highway funds authorized under ISTEA or TEA-21, see 49 C.F.R. § 26.3(a) (2000), are located at 49 C.F.R. pt. 26.

The current regulations specify that the presumption of economic disadvantage automatically is rebutted for any individual whose net worth is above $750,000, without a requirement of further proceedings. See id. § 26.67(b)(1) (2000). This conforms with SBA regulations concerning re-

certification of economic disadvantage.   See 13 C.F.R. § 124.104 (2000).  The

current regulations also retain the requirement that businesses not exceed a

certain amount of gross receipts in order to be eligible for the DBE program.   See

49 C.F.R. § 26.65(b) (2000).

Regarding the allocation of subcontracts to DBEs, the current regulations

explicitly prohibit the use of quotas.   See id. § 26.43(a).  Similarly, the current

regulations prohibit use of set-asides except in "limited and extreme

circumstances . . . when no other method could be reasonably expected to redress

egregious instances of discrimination."   Id. § 26.43(b).  Although acknowledging

that ISTEA and TEA-21 set a goal of 10% DBE participation in government

contracts, the current regulations term this "an aspirational goal at the national

level," id. § 26.41(b), which "does not authorize or require recipients to set

overall or contract goals at the 10 percent level, or any other particular level,"   id.

§ 26.41(c). [40]

Extensive regulatory requirements must be met before goals may be set for

DBE participation in a particular market.   See id. § 26.45.  Goals must be based

on "demonstrable evidence of the availability of ready, willing and able DBEs

---

[40] The term "recipient" is defined by the regulations as "any entity, public
or private, to which DOT financial assistance is extended, whether directly or
through another recipient, through the programs of the . . . FHWA." 46 C.F.R.
§ 26.5 (2000).  The FLHP is such a program and therefore is a "recipient" for
purposes of the relevant regulations.   See 23 C.F.R. § 645.105(f) (2000).

relative to all businesses ready, willing and able to participate" and must make "reference to the relative availability of DBEs in [the recipient's local] market." Id. § 26.45(b). In addition, goal setting must involve "examining all evidence available in [the recipient's] jurisdiction." Id. § 26.45(c). Such evidence may include census data and valid disparity studies. See id. § 26.45(c)(1)-(3). After examining this evidence, the recipient must adjust its DBE participation goals by examining the capacity of DBEs to perform needed work, disparity studies, and other evidence. See id. § 26.45(d). When submitting these goals, the recipient must include a description of the methodology and evidence used in setting them. See id. § 26.45(f)(3). Finally, there is no requirement that the recipient actually meet its goals, merely that it make a good faith effort to do so; failure to meet goals will not subject a recipient to penalties or to being held in noncompliance as long as good faith efforts were made. See id. § 26.47(a).

Wherever possible, the current regulations require recipients to use race-neutral means to "meet the maximum feasible portion" of their overall DBE participation goals. Id. § 26.51(a); see also id. § 26.51(f) (if a recipient can meet its overall goals through race-neutral means, it must implement its program without the use of contract goals). The current regulations also outline several race-neutral means available to program recipients including helping overcome

bonding and financing obstacles, providing technical assistance, establishing programs to assist start-up firms, and other methods.    See id. § 26.51(b).

For those not falling into one of the categories to which a presumption of social disadvantage applies, the current regulations retain procedures for non-minorities to participate in the DBE program.  Consistent with the changes in SBA regulations, proof of social and economic disadvantage by those not so presumed may be shown by a preponderance of the evidence.    See id. §§ 26.61(d), 26.67(d).  Additionally, the current regulations require recipients to make sure DBEs are not "so overconcentrated in a certain type of work as to unduly burden the opportunity of non-DBE firms to participate."    Id. § 26.33(a).

Finally, as to any part of the foregoing DBE statutory and regulatory framework, the current regulations allow recipients to seek waivers and exemptions, despite the already non-mandatory nature of the DBE programs.    See id. § 26.15.  In this way, the statutory and regulatory scheme provides yet another means of ensuring that the program is not applied more broadly than warranted.

3.  SCC

The government maintains, and Adarand does not dispute, that the SCC, which spawned this litigation in 1989, is no longer in use. (    See Appellants' Supp. Br. Attach. 1 (memorandum from Arthur E. Hamilton, Federal Lands Program Manager to Federal Lands Highway Division Engineers stating that

"[t]he SCC will not be placed in any future invitations for bids" and "shall be removed by amendment from any invitations for bids where the bid opening has not taken place").)

In November 1997, before the discontinuation of its use, the SCC was revised by the addition of a new section [41] which creates further conditions of eligibility for the program. (See id. Attach. 2 (new section of the SCC).) To begin with, subject to modification based on DBE availability, at least 10% of the prime contract must go to DBEs for SCC eligibility. If a DBE subcontractor is hired, that DBE may only contract out to non-DBEs "for onsite work . . . incidental to, and necessary for the accomplishment of," the subcontract, in an amount not to exceed 50 percent of the value of the DBE's subcontract. (Id. at 2.) In addition to the 1.5-2% cap on the total amount of the prime contract that may be awarded pursuant to the SCC, the new section adds a further cap of $50,000 if subcontracting to one DBE and $100,000 if subcontracting to more than one DBE.

---

[41] It is unclear from the record whether the 1997 revision to the SCC entailed the addition of a new section or the replacement of the previous one. The revision instructs those using the SCC to "[a]dd the following [revision]," (Appellants' Supp. Br. Attach. 2 at 1), rather than replace the existing SCC, and we thus assume the 1997 revision is an addition to the SCC. However, in either case, our analysis in this opinion remains the same.

The revised SCC retains the provision furnishing prime contractors with "[c]ompensation . . . to locate train, utilize, assist, and develop DBEs to become fully qualified contractors in the transportation facilities construction field," but adds the explanation that this compensation is provided "to offset costs and anticipated risks associated with awarding subcontracts to small business concerns owned and controlled by socially and economically disadvantaged individuals (DBE)." ( Id. at 1.)

Finally, the new section provides an alternative route to certification, "ad hoc certification" based on "self certification" accompanied by the requisite documents to demonstrate qualification for the program, as well as "documentation showing the disposition of any previous application for certification the subcontractor has made to any Federal, State or local Government agency." ( Id.) If a would-be self-certified DBE has already been rejected by a government agency, ad hoc certification will not be granted "unless the reasons for [the previous] denial have been resolved." ( Id.)